UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DANIEL E. GILL, THOMAS C. McDERMOTT,
and JAY T. HOLMES,

Plaintiffs,

vs.

BAUSCH & LOMB SUPPLEMENTAL
RETIREMENT INCOME PLAN I,
BAUSCH & LOMB INCORPORATED,
and COMPENSATION COMMITTEE OF
THE BAUSCH & LOMB BOARD OF
DIRECTORS,

Defendants.

Civil Action No.:

09-CV-6043 CJS/MWP

---

# MEMORANDUM OF LAW IN SUPPORT
# OF PLAINTIFFS' MOTION FOR
# SUMMARY JUDGMENT

---

Harold A. Kurland (hkurland@wardgreenberg.com)
Heidi S. Martinez (hmartinez@wardgreenberg.com)
Taren N. Greenidge (tgreenidge@wardgreenberg.com)
*Attorneys for Plaintiffs*
WARD GREENBERG HELLER & REIDY LLP
300 State Street
Rochester, New York 14614
(585) 454-0700

# **TABLE OF CONTENTS**

Table of Authorities ........................................................................................................... ii

Preliminary Statement ........................................................................................................ 1

Facts and Procedural Background ...................................................................................... 2

Argument ............................................................................................................................ 8

POINT I: B&L'S DECISIONS TO ISSUE LUMP SUM PAYMENTS AND
    TERMINATE SERP I MUST BE REVIEWED *DE NOVO* BECAUSE B&L
    EMPOYEES WERE NOT AUTHORIZED TO INTERPRET SERP I ........................ 8

POINT II: B&L'S DECISION TO MAKE THE LUMP-SUM PAYMENTS AND
    TERMINATE SERP I BASED ON THE CHANGE IN CONTROL
    PROVISION VIOLATED SERP I AND ERISA ......................................................... 13

    A. The Change In Control Provision Does Not Apply ............................................. 13

    B. The Change in Control Provision Cannot Be Construed To Reduce
      Vested Benefits ................................................................................................... 18

POINT III: B&L'S DECISION CANNOT STAND EVEN UNDER DEFERENTIAL
    REVIEW ................................................................................................................... 21

Conclusion .......................................................................................................................... 25

## TABLE OF AUTHORITIES

Cases

*Bruch v. Firestone Tire & Rubber Co.,* 828 F.2d 134, 144 (3d Cir. 1987) ..................................... 9

*Diamond v. Reliance Std. Life Ins. Co.,* 672 F. Supp. 2d 530 (S.D.N.Y. 2009) ........................... 25

*Dittmann v. Dyno Nobel, Inc. Defined Benefit Pension Plan I,* No. 97-CV-1724, 1999 WL

727464 (N.D.N.Y. Sept. 10, 1999) ........................................................................................ 20

*Durakovic v. Building Serv. 32 BJ Pension Fund,* 609 F.3d 133 (2d Cir. 2010) ......................... 25

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989) ......................................................... 9

*Fishbein v. Miranda,* 785 F. Supp. 2d 375 (S.D.N.Y. 2011) ........................................................ 12

*Gallo v. Madera,* 136 F.3d 326 (2d Cir. 1998) ............................................................................ 27

*Gill v. Bausch & Lomb Supp. Income Ret. Plan I,* No. 09-CV-6043, 2011 WL 2413411

(W.D.N.Y. June 10, 2011) ..................................................................................................... 13

*Hobson v. Met. Life Ins. Co.,* 574 F.3d 75 (2d Cir. 2009) ............................................................ 23

*Infantolino v. Joint Ind. Bd.,* No. 06-CV-00520, 2007 WL 879415 (E.D.N.Y. Mar. 15, 2007) .. 13

*Kinek v. Paramount Comm'n, Inc.,* 22 F.3d 503 (2d Cir. 1994) .................................................... 21

*Kosakow v. New Rochelle Radiology Assoc.,* 274 F.3d 706 (2d Cir. 2001) ................................. 15

*Masella v. Blue Cross & Blue Shield of Conn., Inc.,* 936 F.2d 98 (2d Cir. 1991) ....................... 15

*McIntyre v. Aetna Life Ins. Co.,* 581 F. Supp. 2d 749 (W.D. Va. 2008) ....................................... 24

*Mertens v. Hewitt Assoc.,* 508 U.S. 248 (1993) ........................................................................... 12

*Met. Life Ins. Co. v. Glenn,* 128 S. Ct. 2343 (2008) ....................................................... 25, 26, 28

*O'Connor v. Civil Service Employees Ass'n, Inc.,* 82 F. Supp. 2d 7 (N.D.N.Y. 2000).... 15, 24, 25

*O'Rourke v. Pitney Bowes, Inc.,* No. 95-Civ. 10288, 1997 WL 431091 (S.D.N.Y. July 31, 1997)

.................................................................................................................................................. 15

*Perreca v. Gluck,* 295 F.3d 215 (2d Cir. 2002) ............................................................ 15

*Price v. Xerox Corp.,* 445 F.3d 1054 (8th Cir.2006) .................................................. 13

*Pulvers v. First Unum Life Ins. Co.,* 210 F.3d 89 (2d Cir. 2000) ............................... 24

*Rubio v. Chock Full O'Nuts Corp.,* 254 F. Supp. 2d 413 (S.D.N.Y. 2003) ....... 9, 10, 15

*Sanford v. Harvard Ind., Inc.,* 262 F.3d 590 (6th Cir. 2001) ...................................... 14

*Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226 (2d Cir. 1995) ................................. 9, 14

*Shelby County Healthcare Corp. v. Majestic Star Casinio LLC,* No. 06-2549, 2008 WL 782642
(W.D. Tenn. Mar. 20, 2008) ............................................................................... 13

*Strope v. Unum Provident Corp.,* No. 06-CV-628C, 2010 WL 1257917 (W.D.N.Y. Mar. 25,
2010) ............................................................................................................. 23, 24

*Sullivan v. LTV Aerospace and Defense Co.,* No. 91-CV-7138, 1993 WL 405495 (W.D.N.Y.
Sept. 30, 1993) ........................................................................................... 23, 24, 26

*Williams v. Met. Life Ins. Co.,* No. 09-CV-280JTC, 2011 WL 1099130 (W.D.N.Y. Mar. 22,
2011) ..................................................................................................................... 24

*Yaw v. First Unum Life Ins. Co.,* No. 03-CV-275S, 2006 WL 839420 (W.D.N.Y. Mar. 28, 2006)
......................................................................................................................... 26


Statutes

29 U.S.C. § 1132(a) ........................................................................................................ 8

29 U.S.C. 1054(g)(1) ..................................................................................................... 19

29 U.S.C. § 1001, *et seq.* .............................................................................................. 1

## PRELIMINARY STATEMENT

This action under ERISA[1] arises from defendants' breach of their obligation to pay plaintiffs benefits pursuant to the Bausch & Lomb Supplemental Retirement Income Plan I ("SERP I") by defendant Bausch & Lomb Incorporated ("B&L") having decided to (1) stop paying monthly benefits to plaintiffs, which they had been receiving under SERP I, (2) pay cash lump-sum amounts to plaintiffs having a value substantially below the actuarial equivalent value of the future benefits to which they were then entitled, and (3) terminate SERP I, which, had it been accomplished, would have given B&L the right to a reversion of millions of dollars that were in secular trusts restricted to funding the SERP I benefits.

Those at B&L who made or participated in the decision to make the lump sum payments and terminate plaintiffs' future benefits under SERP I did not have authority to do so, they ignored the conclusions of nationally-recognized consultants regarding that exact issue, whose advice they had solicited, and they failed to report what they had done to any Committee of B&L's Board of Directors.  They also ignored the plain words of the applicable SERP I provisions, as well as their purpose, and their decision deprived the beneficiaries of their vested rights in violation of SERP I and ERISA.  Not only was their decision improper; it also was arbitrary and capricious.  Furthermore, the decisions of defendant Compensation Committee of the Bausch & Lomb Board of Directors ("the Committee") to reject the SERP I beneficiaries' challenges to these adverse benefit determinations, both when first presented and on appeal, also were arbitrary and capricious because they ignored critical underlying facts, did not follow the plain words of SERP I, did not consider the purpose of the provisions at issue, and abdicated their fiduciary obligations under SERP I through virtually total delegation to outside counsel.

---

[1] Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.*

1

The material facts regarding the foregoing deficiencies are not in dispute, so this case is ripe and appropriate for summary judgment in favor of plaintiffs determining as a matter of law that defendants breached their obligations to plaintiffs in violation of ERISA and SERP I.

## FACTS AND PROCEDURAL BACKGROUND[2]

Plaintiffs are retired top executives of B&L.  Gill was CEO until 1996, McDermott was President until 1993, and Holmes retired as Chief Administrative Officer in 1997.  Statement of Material Facts Not in Dispute ("Fact Statement") ¶ 2.  They were the only beneficiaries of SERP I, and were the only Participants in SERP I.  Response to request for admission no. 11, Ex. G[3]. Their rights under SERP I were vested before the effective date of the current version of SERP I, restated December 18, 1990 (Responses to requests for admission nos. 11, 12, and 13, Ex. G), and all three were retired and receiving benefits under SERP I before 2007, when the decisions at issue were made.  Fact Statement ¶ 13.

SERP I defines "Participant" as "an employee of the Company who has been selected to participate in the Plan," with "Plan" defined as SERP I.  SERP I § 2(f), Ex. A.  SERP I defines "Retired Participant" as "a former Participant who is receiving benefits under this Plan."  SERP I § 2(h).  It is admitted that all three plaintiffs were Retired Participants.  Fact Statement ¶ 12. SERP I § 4(b) provides that a Participant "shall become vested in his/her benefit" upon selection as a Participant.  Section 5(a) provides for an "annual after tax benefit payable to each Retired Participant," which § 5(c) states shall be "in equal monthly installments for the lifetime of such vested Participant."  Section 8(b) also provides that on the death of a Retired Participant, the

---

[2]The material facts and procedural background are set forth in detail in the Kurland affidavit and supported by the accompanying exhibits.

[3] References to exhibits in the format "Ex. A" are to exhibits to the Kurland affidavit.

surviving spouse shall receive a continuation of benefits at 50% of the Retired Participant's level of benefits for the life of the surviving spouse.

There are several other relevant provisions of SERP I. Section 9 provides that B&L is required to establish an irrevocable secular trust for each Participant, and to fund it adequately, and that B&L remains responsible to pay benefits to each vested Participant. Section 12 provides that SERP I may be amended or terminated, but that "no amendment, suspension, or termination" of SERP I "shall impair or reduce the rights" of any vested Participant before the date of such change.

Section 13 provides that in the event of a "Change of Control" of B&L, "Participants shall be fully vested in the benefit set forth in section 5," and that "such benefit . . . shall be converted to a cash lump sum and paid within 15 days following the Change of Control." That section further provides that "The Plan and its associated trusts shall continue in effect and survive any Change of Control," and any lump sum would offset later benefits required to be paid. SERP I, § 13.

Section 3 of SERP I relates to administration, and provides that SERP I shall be "administered by the Vice President of Human Resources" of B&L, and that the Committee on Management of B&L "shall have authority and discretion to . . . determine the rights and benefits of Participants under the Plan . . . interpret the Plan, and make all determinations deemed necessary or desirable for the administration of the Plan."

B&L established secular trusts for each SERP I beneficiary as called for in SERP I. They are in identical form. Kurland aff. ¶ 32. Each trust provides at § 7.1 that it "shall continue for such time as may be necessary to accomplish the purpose for which it was created," and at § 7.2 that on termination, the trustee "shall liquidate the Trust Fund" and "shall distribute the net

balance thereof," and that any excess "shall be returned to the Company." That provision gave B&L a reversion right as to any remaining assets when trust obligations were terminated.

At some point in the spring of 2007, B&L began discussions with Warburg Pincus, a private equity firm, regarding B&L going "private," and no longer being a public company. Zarrella dep. 13:5-13; 15:14-16:7; 16:14-18:19, Ex. Y. B&L formed a team to work on the Warburg Pincus acquisition. Zarrella dep. 50:6-51:10, Ex. Y. Human resources and benefits staffs were represented on that team, and Laurie Zaucha, Vice President, Compensation and Benefits, "was the active member of the team." Zarrella dep. 51:11-52:12, Ex. Y. Zarrella did not recall whether David Nachbar, Senior Vice President, Human Resources, was involved (Zarrella dep. 51:11-52:12), and Nachbar did not recall his involvement either. Nachbar dep. 88:10-89:10; 115:25-118:6; 131:4-17, Ex. Y.

In June 2007, B&L requested and obtained a report from Mercer Human Resource Consulting, one of its benefits consultants, analyzing the applicability of the SERP I change in control provision to the three SERP I beneficiaries. Ex. J. Mercer was a well-respected, national consulting firm in human resources. Zaucha dep. 21:4-22:3, Ex. Y.

The Mercer report, which was sent to Zaucha, among others, concluded that the change in control provision of SERP I was not applicable because its only beneficiaries were Retired Participants, who were not covered and were not intended to be covered by the change in control provision. The Mercer report noted that SERP I makes a distinction between "Participants" and "Retired Participants," that the SERP I change in control provision only refers to Participants, as opposed to Retired Participants, and that excluding Retired Participants, as opposed to active employees of B&L, from application of the change in control provision makes sense because the purpose of the change in control provision is to "ensure the continued employment and

objectivity of senior executives prior to a potential change in control, notwithstanding any risks or uncertainties created by the possible change in control." Ex. J.

B&L obtained a similar opinion from another consultant, Westport Strategies, on August 9, 2007. That report concluded, in response to a specific request for Westport's views as to the applicability of the change in control provision, that "A change of control at B&L should not have any effect on it [SERP I]." Ex. K. On August 17, Christopher Reigle, who was senior benefits analyst at B&L and had solicited the Mercer report (Ex. K), wrote Nadir Minocher of Westport that "I think in the end everyone would like these SERP plans to go away." Ex. L.

On September 19, Zaucha wrote each of the three SERP I beneficiaries letters advising them that their "SERP I benefits will be converted to a cash lump sum" in the event of a change of control relating to the Warburg Pincus merger, and that "After this payout, your participation in SERP I will cease and you will receive no further benefit under the plan." Ex. M. On September 24, Efrain Rivera, B&L's Senior Vice President and Chief Financial Officer, wrote Wells Fargo Bank, the trustee of the SERP I trusts, a letter directing that "all monthly benefits payable to individuals in [SERP I] be stopped immediately," and that "[a]ny remaining benefits due participants . . . will be paid out in a lump sum upon further instructions." Ex. N. Roughly a week later, B&L instructed Wells Fargo, the SERP I trustee, to deposit the lump sum amounts "for payment on Friday, October 5[th]." Ex. P. The amounts B&L "submitted to Wells Fargo for payment" were $6,350,098.65 for Gill, $2,121,058.81 for McDermott, and $1,461,037.75 for Holmes. Ex. P.

Patrick Martin, a financial advisor to Gill (Martin aff. ¶ 1), contacted Zaucha in September, before the payments were made, and objected to the proposed lump sum payments. Dep. Exs. P-79 and P-80, Ex. R. Zaucha wrote Martin a detailed letter dated October 2, advising

him in part that B&L had reviewed the issue again in response to his inquiry, had obtained the opinion of a "another outside benefits lawyer," and was standing by its decision to make the payments in the amounts it had determined, but was correcting an error it found that had the effect of reducing those payments further. Dep. Ex. P-102, Ex. R.

The lump sum amount paid to Gill was substantially lower than the "actuarial equivalent value" of the future benefits to which he was entitled under SERP I. Martin aff. ¶ 7. Each of the lump sum payments was substantially less than the present value of the future benefit under SERP I that B&L had reported to the SERP I beneficiaries three months earlier, as of June 30, 2007, which was $7,467,012 for Gill, $2,598,301 for McDermott, and $1,781,723 for Holmes. Ex. I. Furthermore, after these lump sum amounts were paid, each of the three secular trusts had a significant balance, and the total of the three was more than $7.3 million, which, net of expenses, was available for reversion to B&L on termination of the trusts. Ex. Q.

Gill, McDermott, and Holmes obtained counsel as of October 5, 2007. Kurland aff. ¶ 48. Counsel wrote B&L raising objections regarding the expected payments, noting they "are insufficient, by substantial amounts," and seeking an accounting and copies of all communications with consultants and the trustee regarding such issues. Ex. S. B&L advised that it was reorganizing its board of directors in light of the Warburg acquisition, and that a newly constituted committee of the board, which was later identified as the Compensation Committee, would consider the issues raised. The new Compensation Committee, formed in November 2007, consisted of Sean Carney, Scott Mackesy, and Elizabeth Weatherman. Response to Interrog. No. 1, Ex. F. Carney and Weatherman are Warburg Pincus managing directors (Carney dep. 5:11-16; Weatherman dep. 7:19-25, Ex. Y), and Mackesy is a managing director of Welsh Carson, a minority owner of B&L after the acquisition. Mackesy dep. 5:2-23.

6

The Committee retained Ropes & Gray LLP to represent it as to the SERP I claims.
Kurland aff. ¶ 52. Ropes drafted and issued ERISA § 503 procedures (which did not previously
exist [Response to Admission No. 20, Ex. G]) and presented them to the Committee. Dep. Ex.
P-83, Ex. U. Proskauer Rose LLP, which represented B&L as to these claims, submitted a
"Company Position Statement" to the Committee, as well as other letters. Kurland aff. ¶ 49.
B&L asserted that the claim was a "claim for additional benefits," rather than a challenge to the
decision that B&L already had made. Kurland aff. ¶ 50. All the Committee's communications
were handled by Ropes. Ropes also drafted and presented decisions denying the claim and
denying the appeal, both of which were sent out unchanged. Dep. Exs. P-86 and April 16, 2008
letter, Ex. V, and P-100 and Dec. 11, 2008 letter, Ex. X.

The Committee never met in person, according to Mackesy (Mackesy dep. 17:8-19:4, Ex.
Y), but did have some telephone meetings. Mackesy dep. 35:24-36:2. Carney testified that there
were meetings, but he did not recall whether any were in person (Carney dep. 53:7-54:24, Ex.
Y); Weatherman had no recollection at all of meetings or what they discussed or reviewed, if
anything (Weatherman dep. 46:15-48:22; 49:6-50:24, Ex. Y), and she testified that she did not
recall anything about the claim. Weatherman dep. 68:2-23. The Committee was not told about
or aware of the Mercer or Minocher (Westport) consultant opinions. Mackesy dep. 66:3-12;
Carney dep. 111:13-22. They considered their role limited to reviewing the text of SERP I.
Mackesy dep. 74:20-24; 178:8-179:14; Carney dep. 44:16-24; 105:12-110:17; 129:9-131:15.
None of the three members could point to any evidence of what they discussed or considered
except for SERP I itself and unidentified correspondence, nor of their deliberations. Mackesy
dep. 80:21-85:12; Carney dep. 56:12-60:19; 173:17-176:2; 177:7-10. Their written trail of
deliberations is reproduced at Ex. W, consisting of a few curt messages including Mackey's

7

comment that "We should just deny there [*sic*] claim and get on with it." Dep. Ex. P-93. *See also* Dep. Exs. P-94, P-95, and P-96, Ex. W.

This action was filed January 29, 2009, the month after the Committee's denial of plaintiffs' appeal. Complaint, Docket. No 1. Defendants moved to dismiss, arguing that the claim for denial of benefits did not state a viable claim as a matter of law, and that the Court should apply a deferential review standard and under such standard should dismiss the complaint. Defendants' Memorandum of Law, Docket No. 11. The Court denied the motion seeking to dismiss the denial of benefits cause of action, holding that it was premature, and that even assuming that SERP I granted the requisite discretion, discovery was necessary before the merits could be considered. Amended and Corrected Decision and Order filed Sept. 29, 2009, Docket No. 24. Defendants then answered. Docket No. 26. Discovery has been arduous, and has required two motions to compel thus far. Docket Nos. 33 and 53. Nevertheless, plaintiffs have conducted sufficient discovery, and this case is now ripe for summary judgment.

## ARGUMENT

### POINT I

**B&L'S DECISIONS TO ISSUE LUMP SUM PAYMENTS AND TERMINATE SERP I MUST BE REVIEWED *DE NOVO* BECAUSE B&L EMPOYEES WERE NOT AUTHORIZED TO INTERPRET SERP I**

ERISA grants beneficiaries the right to sue to recover benefits due, enforce their rights under a plan, or clarify their rights to receive future benefits. 29 U.S.C. § 1132(a). The first task for the court considering an ERISA beneficiary's challenge to an adverse benefit determination is to decide what standard of review to apply. Under well-established Supreme Court precedent, a beneficiary is entitled to a *de novo* review of any adverse benefit determination unless the plan

gives the administrator or fiduciary discretionary authority. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Rubio v. Chock Full O'Nuts Corp.,* 254 F. Supp. 2d 413, 420-21 (S.D.N.Y. 2003). Only where the clear language of the plan confers that discretionary authority should the Court afford deference to the decision maker and review the benefit determination under an "arbitrary and capricious" review standard. *Firestone,* 489 U.S. at 115.

Furthermore, if a plan confers discretionary authority on a particular entity, only the decisions of that entity are entitled to deference; where a party without discretionary authority makes the benefit determination at issue, *de novo* review is required. *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 229 (2d Cir. 1995). The burden of establishing that a benefits determination is entitled to deference rests with the party claiming such entitlement. *Id.* at 230 (defendant pension committee bore the burden of establishing entitlement to deferential review "since the party claiming deferential review should prove the predicate that justifies it").

Here defendants cannot establish their entitlement to deferential review for several reasons. First, § 3 of SERP I, dealing with administration, grants only the Committee on Management of the Board of Directors discretion. Ex. A. The language is clear that such Committee has discretion to "determine rights and benefits of Participants" or "interpret the Plan" or "make all determinations deemed necessary or desirable for administration of the Plan," while the Vice President of Human Resources has authority to "administer" SERP I. The difference between "administer" and "interpret" is well understood under ERISA authority, with "administer" meaning ministerial functions, not discretionary ones such as interpretation of plan provisions or directing the disposition of plan assets. *See, e.g., Rubio,* 254 F. Supp. 2d at 419-21 (appeals subcommittee interpreted plan, an "inherently discretionary" act, when it read the plan so as to determine the how one of its provisions applied to the plaintiff).

Laurie Zaucha made great effort in her deposition to insist that she did not "interpret" SERP I, but was only "reading." Zaucha dep. 67:16-68:22, Ex Y. She further testified that she did not "make a decision on my own" as to the lump sum issue, but she could not identify who did make such a decision. Zaucha dep. 170:4-171:13. Christopher Reigle, B&L's senior benefits analyst who had earlier worked for Mercer Human Resources Consulting for 10 years (Reigle dep. 5:19-6:4; 6:14-23; 19:17-20:6), testified that he was not using the terms "interpret" or "opinion" in his testimony about SERP I because he knew that SERP I reserved such authority to a committee of the Board of Directors. Reigle dep. 95:3-96:2, Ex. Y.

There is no evidence that the Committee on Management or any other Board committee or Board member had any involvement in the decisions at issue. Zaucha dep. 54:18-55:3; 60:4-10; Nachbar dep. 88:10-89:10, Ex. Y. Furthermore, Zarrella testified that the issue was never presented to the B&L Board of Directors or the Management Committee or Compensation Committee. Zarrella dep. 88:18-23, and he would have been involved in any such matter that went to the Board or its committees. Zarrella dep. 58:18-61:7. Waltrip, who was a member of the Board Compensation Committee at the relevant time, also testified that the Board and its Compensation Committee had no involvement with SERP I or the lump sum payment issue. Waltrip dep. 15:16-19; 23:9-1425:18-26:1.

Instead, it appears that the decision was left to Zaucha, who denied that she made any such decision "on my own." Zaucha dep. 170:14-171:13. Zaucha was not even authorized to perform ministerial acts under SERP I, §3, since her title was Vice President, Compensation and Benefits, not Vice President of Human Resources (the person authorized under SERP I § 3 to perform ministerial functions). B&L did not even have a Vice President of Human Resources. Zaucha dep. 49:5-23. Furthermore, Nachbar, who was Senior Vice President, Human Resources,

did not recall doing anything, and there is no evidence that he did.  Rivera, the CFO, denied that he made the decisions (Rivera dep. 17:12-18:14, Ex. Y), and Zarrella did not recall any involvement at all.  Zarrella dep. 80:3-82:7; 88:18-23; 103:7-22.

It does not even appear that a Board Committee on Management existed in 2007. Waltrip, who certainly should know, having 22 years of Board experience and being a member of the Compensation Committee, testified that there was no Committee on Management at that time, although the term was used to refer to the Compensation Committee.  Further, he agreed that a description of Board committees in the B&L 10-K did not identify a Committee on Management.  *See* Zarrella dep. 43:5-20; Waltrip dep. 10:16-11:13, 11:19-13:9.  Only the Committee on Management had the discretionary authority to interpret the Plan terms and make decisions concerning administration of the Plan, and B&L cannot show that the Committee on Management even existed at that time, much less that it exercised such authority.

Defendants' past assertion that the payment of a lump sum benefit is entitled to deferential review because the actions of the B&L HR group were purely "ministerial," and thus there was no "adverse benefit decision" at all at that time, and that the new, post-acquisition Compensation Committee did have discretionary authority to interpret SERP I, and did so as part of a claim for additional benefits, has no merit whatsoever.

B&L's management undoubtedly was acting in an unauthorized, discretionary capacity in deciding how to interpret the SERP I change in control provision.  B&L employees sought and obtained the advice of consultants (Dep. Exs. P-21, Ex. J; P-41, Ex. K), and their messages discuss the fact that a decision was going to be made.  Dep. Ex. P-56, Ex. L.  These are not ministerial functions, especially since the SERP I change in control provision does not refer to Retired Participants.   Nor was the decision to terminate plaintiffs' rights in the plan a

"ministerial" function. *See, e.g., Fishbein v. Miranda,* 785 F. Supp. 2d 375, 387 (S.D.N.Y. 2011) (only persons with "no power to make any decisions as to plan policy, interpretations, practices or procedures . . . perform 'purely ministerial functions' " and, therefore, are not fiduciaries); *see also Mertens v. Hewitt Assoc.,* 508 U.S. 248, 251 (1993) ("not only the persons named as fiduciaries by a benefit plan . . . but also anyone else who exercises discretionary control or authority over the plan's management, administration, or assets . . . is an ERISA 'fiduciary.' ").

Magistrate Judge Payson's determination, in connection with the plaintiffs' first motion to compel discovery, that the adverse benefit determination central to this dispute is not the Committee's review of the decision to issue the lump sum payments, but the initial decision to pay the lump sum amounts and terminate the plan, is correct and should be followed. *Gill v. Bausch & Lomb Supp. Income Ret. Plan I,* No. 09-CV-6043, 2011 WL 2413411, at *6-7 (W.D.N.Y. June 10, 2011)(Docket No. 45)(*citing Price v. Xerox Corp.,* 445 F.3d 1054 (8th Cir.2006); *Infantolino v. Joint Ind. Bd.,* No. 06-CV-00520, 2007 WL 879415, at *5 (E.D.N.Y. Mar. 15, 2007)).

The decisions of the Committee in 2008 are not entitled to deferential review either (quite apart from the September 2007 decision to make the cash lump sum payments being the adverse benefit determination at issue) because there is no evidence that the Committee engaged in a full and fair review of the decisions made by B&L management. The Committee essentially adopted B&L's arguments without conducting any independent investigation. This type of cursory review cannot act to "cure" the unauthorized decision-making of B&L management. *See Shelby County Healthcare Corp. v. Majestic Star Casinio LLC,* No. 06-2549, 2008 WL 782642, at *3-4 (W.D. Tenn. Mar. 20, 2008) (reviewing denial of claim *de novo* where initial decision-maker

was not granted discretionary authority by the plan and there was no evidence that entity with discretionary authority undertook any independent fact-finding); *Sanford v. Harvard Ind., Inc.,* 262 F.3d 590, 596 (6th Cir. 2001) (upholding district court's *de novo* review of benefit determination where unauthorized party had already decided to rescind plaintiff's retirement benefits by the time members of entity vested with discretion reviewed the action, and decision was not made in compliance with plan procedures).

The Committee so completely abdicated its work in favor of a law firm that it was not exercising the type of discretion contemplated by SERP I § 3 or by *Firestone.* Fact Statement ¶¶ 28-31. The Committee cannot show it exercised any discretion at all because it acted solely as a rubber stamp. It did not change a word of the proposed decisions drafted by Ropes & Gray and there is no record of what the Committee did or discussed or considered. The decisions were not even issued by the Committee in its name, so in that sense the "rubber stamp" label is too generous. Defendants cannot meet their burden to show that this type of decision-making somehow trumps the unauthorized decision-making of B&L management and entitles those decisions to deferential review.

**POINT II**

**B&L'S DECISION TO MAKE THE LUMP-SUM PAYMENTS AND TERMINATE SERP I BASED ON THE CHANGE IN CONTROL PROVISION VIOLATED SERP I AND ERISA**

A.    **The Change in Control Provision Does Not Apply**

The Court must apply "traditional principles of contract interpretation" in undertaking a *de novo* review of a disputed plan provision. *Sharkey,* 70 F.3d at 230 (*citing Firestone,* 489 U.S. at 112-13); *O'Rourke v. Pitney Bowes, Inc.,* No. 95-Civ. 10288, 1997 WL 431091, at *6 (S.D.N.Y. July 31, 1997). If the disputed provision is not ambiguous, it must be interpreted and

13

enforced in accordance with its plain meaning. *Rubio*, 254 F. Supp. 2d at 427 (*citing Perreca v. Gluck*, 295 F.3d 215, 223 (2d Cir. 2002); *O'Connor v. Civil Service Employees Ass'n, Inc.*, 82 F. Supp. 2d 7, 11 (N.D.N.Y. 2000). However, to the extent there are ambiguities in the plan language, they must be "construed against the employer, as the drafter of the disputed document." *Rubio*, 254 F. Supp. 2d at 427; *see also Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 107 (2d Cir. 1991). Further, under a *de novo* review, the burden is on defendants to show that plaintiffs' interpretation of the Plan is unreasonable. *Rubio*, 254 F. Supp. 2d at 428; *Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706, 739 (2d Cir. 2001).

SERP I § 13, the change in control provision, simply does not apply to plaintiffs, who at the time of the Warburg acquisition unquestionably were "Retired Participants," defined as "former Participants," as opposed to "Participants," current employees of B&L. SERP I §§ 2(f) and (h); Dep. Ex. 1, Ex. A; Fact Statement ¶ 12. There is no doubt that plaintiffs had been employed by B&L (Fact Statement ¶ 1), that they were vested Participants at the time they were employed (Fact Statement ¶ 3), that they were Retired Participants as of September 2007 (Fact Statement ¶ 12), and that they were receiving benefits at that time pursuant to SERP I (Fact Statement ¶ 13). The change in control provision applies solely to "Participants," the defined term used in SERP I § 13.

That § 13 applies only to Participants also is evident from the context of the change in control provision. First, § 13 states that "Upon a Change in Control (as defined below), each Participant shall be fully vested in the benefit set forth in section 5 hereof, assuming the date of the Change of Control was, for purposes of determining the Participant's accrued benefit and age, the date of Termination of Employment." SERP I § 13. That language, in addition to using "Participant" twice, as opposed to "Retired Participant," obviously applies only to present

employees of B&L, since it substitutes the change in control date for the date of "Termination of Employment." "Termination of Employment" is defined at SERP I § 2(j) as "the cessation of the employer-employee relationship between the Participant and the Company for reasons other than disability."   Obviously that does not apply to Retired Participants, who as of the change in control had already left B&L's employ.  That "Participant" means a current employee also is abundantly clear from § 6, relating to termination of employment, which uses the term "Participant" throughout (since "Retired Participants" already have terminated employment).

The same language is used in the benefits section, § 5, which provides for benefits for "Retired Participants" based on the "vested Participant's age on the date of Termination of Employment."  Plaintiffs here unquestionably were receiving benefits under that provision as of September 2007 and before, and were "Retired Participants" who already had gone through "Termination of Employment."  Clearly § 13 was intended to apply to "Participants" as opposed to "Retired Participants" because that is what it says, and there is no indication to the contrary.

Furthermore, the terms "Participant" and "Retired Participant" are used in various other parts of SERP I, they are defined terms, and they are used in accord with their definitions.  For example, "Participant" is appropriate in § 2(i) because "Retired Participant" is too limiting. "Participant" is appropriate in § 4, where it is used five times, because § 4 discusses when current employees' rights in SERP I vest.  The disability section (§ 7) also uses "Participant," since it is in the context of current employees, and the same is true for the death section (§ 8), which also uses "Retired Participant" in the sub-section "after benefit commencement" (§ 8(b)), which obviously applies to those who are no longer employees and receiving benefits.  The funding section (§ 9) also uses "Participant," since it applies to current employees whose future

15

benefits must be funded through contributions to their trusts.  Finally, § 11 appropriately uses the term "Participant" in the context of the rights of current employees under SERP I.

The foregoing is discussed in such detail only because defendants erroneously asserted to the contrary, in Proskauer's arguments to the Committee and in the Committee's April 14, 2008 rejection, through Ropes & Gray's letter, of plaintiffs' challenge to B&L's adverse benefits decision.  *See* Kurland aff. ¶ 53 and Zorn's letter of April 16, 2008, Ex. V.  Defendants' explanation makes no sense, and never is squared with the purpose of SERP I's change in control clause or the other provisions they cite.

Limiting the change in control clause to Participants (current employees of B&L), makes complete sense in light of the purpose of such clauses, which is to protect current employees, to assure their loyalty and commitment during events related to a change in control, when their jobs could be at risk and their impartial judgment is particularly important to their employer.  Neither of those issues applies to plaintiffs, as retired employees, who were long retired and were no longer responsible for leading B&L or making any of the judgments relating to its potential acquisition by Warburg Pincus.  This is exactly what Mercer Human Resources, the national human resources consulting firm, advised B&L in June 2007, when Mercer reported that the purpose of the change in control clause is to "ensure continued employment and objectivity of senior executives prior to a potential change in control, notwithstanding any risks or uncertainties created by the possible change in control." Dep. Ex. P-21, Ex. J.

The Mercer report, which was not disclosed to plaintiffs until long after they commenced this action, and after they challenged application of the change in control provision to them on the same ground (Kurland aff. ¶¶ 48 and 51), noted the distinction between "Participant" and "Retired Participant" in SERP I, noted that the change in control provision only referred to

16

"Participant," not "Retired Participant," and concluded that the change in control provision should not apply to SERP I, since all of its beneficiaries were retired. That Mercer felt strongly about this is clear from its concluding advice to B&L: "We strongly recommend that you discuss the change in control provisions with your legal counsel before proceeding with any lump sum distributions." Dep. Ex. 21, Ex. J.

The Westport Strategies opinion reached the same result as Mercer's, and it advised B&L that "[a] change in control at B&L should not have any effect on [SERP I]." Dep. Ex. P-41, Ex. K. Documents produced by B&L offer no further hint of B&L's reasoning in rejecting this advice, except for Reigle's statement to Minocher on August 17, 2008 that "I think in the end everyone would like these SERP plans to go away." Dep. Ex. P-56, Ex. L. That is hardly an appropriate reason to deny benefits based on an objective interpretation of SERP I.

B&L witnesses in their depositions also could not support the B&L decision that the change in control provision applied to plaintiffs. Zaucha and Reigle testified that SERP I change in control provision applied to plaintiffs by assuming that "Participant" included "Retired Participant" or ignoring the distinction, arguing they were only "reading" SERP I and not "interpreting" it. Zaucha dep. 30:7-24; 67:16-68:22; 170:4-171:13; Reigle dep. 77:17-83:1085:5-98:8, Ex. Y. The more senior officers denied knowledge of the decision or its basis. Nachbar dep. 88:10-89:10; 131:4-17; Rivera dep. 17:12-18:14; 88:5-91:16; Zarrella dep. 58:18-61:7, 80:3-82:7, 88:18-23; 103:7-22, Ex. Y. The Committee, after the challenge to this decision, stated that SERP I required that result, but never explained why, and never considered the consultant reports advising the contrary. Mackesy dep. 74:20-24; 80:21-85:18, 178:8-179:14; Carney dep. 105:12-110:17, 111:13-22: 129:9-131:15; 173:17-176:2; Weatherman dep. 49:6-50:24, Ex. Y.

17

**B.      The Change in Control Provision Cannot Be Construed To Reduce Vested Benefits**

The change in control provision also cannot be construed to reduce vested benefits because SERP I § 12 contains an absolute prohibition against any action by B&L, even by the Board of Directors or the Compensation Committee, to "impair or reduce the rights under the Plan of any person who is a vested Participant" prior to that date. This provision, as a matter of both ERISA law and contract, prevents B&L from construing the change in control clause to reduce plaintiffs' benefits. 29 U.S.C. 1054(g)(1) ("the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan. . . ."); *see also Dittmann v. Dyno Nobel, Inc. Defined Benefit Pension Plan I*, No. 97-CV-1724, 1999 WL 727464, at *4 (N.D.N.Y. Sept. 10, 1999) (court must look to the language of the plan).

The Martin affidavit states that the lump sum amount paid Gill is substantially less than the actuarial equivalent value of the SERP I plan benefit. Martin aff. ¶ 7. That the lump sum payments were substantially less than the present value at the time of the future benefits to which plaintiffs were entitled under SERP I also is supported by B&L's reports regarding the much higher present value of the future benefit obligations under SERP I as of June 30, 2007, three months earlier. Dep. Ex. P-13, Ex. I. B&L has never even disputed that the lump sum payments it made in 2007 were worth less than the then-present value of plaintiffs' future SERP I benefit stream; it just has argued that § 13 requires use of the calculation method that Martin challenged in September 2007. See Kurland aff. ¶ 46 and annexed Martin messages, Dep. Exs. P-79 and P-80, as well as Zaucha's letter rejecting Martin's argument, Dep. Ex. P-102, all at Ex. R.

The sole basis for B&L's argument was that it had to follow the language in § 13 providing that "such benefit ["the benefit set forth in section 5 hereof"] shall be converted to a cash lump sum and paid within 15 days following the Change in Control utilizing for this

purpose the same actuarial assumptions as are utilized in the Bausch & Lomb Retirement Benefits Plan." That argument fails for several reasons in addition to the fact that the change in control provision only applies to current employees, as discussed in the previous section.

First, § 13 requires that "such benefit" shall be paid, meaning the same benefit provided for in § 5. It does not suggest that a lesser value was permissible, since that would not be the same benefit. Second, paying a reduced benefit would defeat the purpose of the change in control provision, since there is no reason for a change in control provision to produce a reduced benefit. This purpose is set forth in the Mercer report and also was supported by Zaucha, who testified that the purpose of a change in control provision is to protect the beneficiary in the event of a change in control, and that it would be "contrary to that purpose if a Change in Control clause were applied so as to reduce the benefits that the employee otherwise would have been entitled to obtain." Zaucha dep. 45:18-46:5, Ex. Y.

Third, applying the change in control provision in a way that required payment of reduced benefits less than what SERP I required violated SERP I § 12, as described above. The change in control language at issue could not have been intended to require a reduction in benefits, because that would conflict with § 12 as well as its purpose. Just as in any contract construction situation, the different sections of SERP I should not be construed to be in conflict with each other if there is a rational way to construe them consistently. *See, e.g., Kinek v. Paramount Comm'n, Inc.,* 22 F.3d 503, 509 (2d Cir. 1994) (to extent possible, provisions of an ERISA plan should be "read together as a harmonious whole").

Fourth, to the extent that B&L asserts that § 13's plain language requires payment of reduced benefits to its beneficiaries, it was not enforceable at the time that language was added to SERP I, when it was restated December 18, 1990. Ex. A. The prior version of SERP I did not

19

contain such language. Ex. B, § 13, and at the time of the revision plaintiffs already were vested Participants in SERP I. Fact Statement ¶ 3. B&L's Board thus would not have had authority to change SERP I so as to reduce its vested Participants' benefits. It also is clear from comparing the same provisions of SERP I and SERP II that B&L's Board had no such intention, since the prior version of SERP II also had the simpler change in control language (Ex. D, § 15), both SERP I and SERP II were revised at the same time (Exs. A, C), and the revised version of SERP II was a pre-tax plan, while SERP I was an after tax plan, while the new change in control provisions in each plan are substantially the same, and use the same language B&L has relied on regarding actuarial assumptions they claim required the reduced benefit payments. Exs. A, C.

It makes no sense to require the same actuarial assumptions for converting a future payment stream to a cash lump sum in both a pre-tax plan and an after tax plan. In the after tax plan, the benefits actually received by the beneficiaries have already been taxed, or will be "grossed up" as necessary so that the effect is that the beneficiaries do not have to pay income taxes on those amounts. SERP I, § 5. "The amounts payable under this Plan shall be grossed up (as necessary) to provide the specified after tax benefit based on the maximum combined federal and state income tax bracket in effect . . ." Ex. A. This is not part of SERP II. Clearly the amount required to be paid is different in the two cases. B&L has not demonstrated how use of the Retirement Benefits Plan actuarial method achieves the result intended under SERP I, of producing "such benefit," that is the after tax benefit SERP I requires. Its past reliance on the § 13 language without appropriate justification should be rejected. *See* Dep. Ex. P-102, Ex. R; Zorn letter of April 14, 2008, Ex. V. For all these reasons, the change in control provision should not have been applied to permit payments of cash lump sum amounts valued less than the SERP I benefits, nor to terminate payment of further SERP I benefits to the SERP I beneficiaries.

## POINT III

## B&L'S DECISION CANNOT STAND EVEN
## UNDER DEFERENTIAL REVIEW

Even if the Court were to apply the deferential "arbitrary and capricious" standard of review to this case, B&L's decision to apply the change in control provision to the SERP I beneficiaries and issue lump sum payments worth less than the benefits to which they are entitled under SERP I and terminate their rights to receive future benefits under SERP I cannot be upheld. An adverse benefit determination is arbitrary and capricious where it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Strope v. Unum Provident Corp.*, No. 06-CV-628C, 2010 WL 1257917, at *4 (W.D.N.Y. Mar. 25, 2010) (*quoting Hobson v. Met. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009); *Sullivan v. LTV Aerospace and Defense Co.*, No. 91-CV-7138, 1993 WL 405495, at *5 (W.D.N.Y. Sept. 30, 1993) (decision is arbitrary and capricious where it is made in bad faith or is unreasonable).

In determining whether an administrator has abused its discretion, the court should consider a number of factors, including whether the decision is consistent with the plan's plain language, "the adequacy of materials considered to make the decision and the degree to which they support it," the purposes and goals of the plan, whether the interpretation of plan provisions is consistent with other provisions, and whether "the decision-making process was reasoned and principled." *McIntyre v. Aetna Life Ins. Co.*, 581 F. Supp. 2d 749, 756 (W.D. Va. 2008). A plan administrator's decision can be arbitrary and capricious where it "interprets the plan in a manner inconsistent with its plain words." *Strope*, 2010 WL 1257917, at *4 (*quoting Pulvers v. First Unum Life Ins. Co.*, 210 F.3d 89, 92-93 (2d Cir. 2000). Likewise, an adverse benefits decision can be arbitrary and capricious where an administrator disregards defined terms in a plan or, by its interpretation of plan language, renders some provisions of the plan superfluous. *Williams v.*

21

*Met. Life Ins. Co.,* No. 09-CV-280JTC, 2011 WL 1099130, at *5 (W.D.N.Y. Mar. 22, 2011); *O'Connor,* 82 F. Supp. 2d at 11; *Sullivan,* 1993 WL 405495, at *5.

In *O'Connor,* the Court rejected defendants' contention that the term "Officer," which was defined by the plan as "the President, Executive Vice President, Six (6) Vice Presidents, Secretary and Treasurer of the Employer," included former officers, particularly where another term in the plan, "Participant," was defined as an "Officer or former Officer who has, on or after the Effective Date, met the requirements of eligibility and who has been designated by the Employer to Participate in this Plan." 82 F. Supp. 2d at 11. The Court concluded that the term " 'Officer' is thus limited to active, serving officials while 'Participant' draws no distinction between current and former officers," and rejected defendants' contrary interpretation as arbitrary and capricious. *Id.*

The Court also must consider the existence of any procedural irregularities or conflicts of interest when assessing the reasonableness of an adverse benefit decision. *Met. Life Ins. Co. v. Glenn,* 128 S. Ct. 2343, 2344-45 (2008) (court must consider conflict of interest as a factor when determining whether administrator abused its discretion); *Durakovic v. Building Serv. 32 BJ Pension Fund,* 609 F.3d 133, 138 (2d Cir. 2010) (same); *Williams,* 2011 WL 1099130, at *5 (procedural irregularities should be taken into account in determining whether plan administrator abused its discretion); *Diamond v. Reliance Std. Life Ins. Co.,* 672 F. Supp. 2d 530, 535-36 (S.D.N.Y. 2009) ("In addition to weighing the conflict of interest, procedural irregularities in the administrative process also constitute factors that should be taken into consideration in determining whether a plan administrator abused its discretion in denying a claimant's claim for benefits under the ERISA plan.").

A conflict of interest exists where an employer makes the adverse benefit determination and also funds the plan because "every dollar saved . . . is a dollar in the employer's pocket." *Glenn,* 128 S. Ct. at 2348 (*quoting Bruch v. Firestone Tire & Rubber Co.,* 828 F.2d 134, 144 (3d Cir. 1987)). A conflict of interest will be given greater importance where "circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 2351.

Moreover, a fiduciary has an obligation to "deal honestly and fairly with the claims of plan participants," and a plan administrator's failure to do so in connection with an adverse benefit decision can be grounds to find the decision arbitrary and capricious. *Yaw v. First Unum Life Ins. Co.,* No. 03-CV-275S, 2006 WL 839420, at *2 (W.D.N.Y. Mar. 28, 2006); *Sullivan, supra,* 1993 WL 405495 at *5. Where the administrator has failed to act in good faith, subsequent layers of review will not cure the prejudice to the beneficiary. *Yaw,* 2006 WL 839420, at *3 (where initial decision maker abused her discretion in deciding plaintiff's claim for benefits and her "conclusion and analysis necessarily framed the issues" and rendered "the entire claim review process . . . invalid from its inception" despite subsequent layers of review).

Here, virtually every indicia of unreasonableness is present. First, defendants ignored the plain language of SERP I in concluding that the change in control provision applied to the SERP I beneficiaries, as discussed at Pt. II(A) above. This alone is sufficient basis to find the determination to be arbitrary and capricious. *See Gallo v. Madera,* 136 F.3d 326, 330 (2d Cir. 1998) ("Even when trustees of a pension plan are entitled to deference in interpreting the terms of the plan, deference cannot be so broad as to permit them to graft additional requirements onto unambiguous plan definitions.").

Second, defendants unquestionably had a conflict of interest, because B&L had the right to reversion of the residual funds in SERP I, in this case more than $7.3 million, less expenses.

Here the Committee was not an independent plan administrator, but was part of the employer and plan sponsor, defendant B&L, on whose Board of Directors the members of the Committee served. They obviously had split fiduciary duties and split loyalty, and they had an incentive to approve the decision that would permit the reversion to proceed. Any assertion that the $7.3 million is a trivial amount in light of the size of the Warburg transaction or other financial considerations the Committee or B&L faced is no defense at all. Further, there was evidence that B&L desired to terminate SERP I (Dep. Ex. P-56, Ex. L), and terminating SERP I would eliminate its responsibility to fund and administer SERP I in the future. Thus the fiduciary was conflicted because it was not independent of the employer and plan sponsor, which compounded the conflict created by the fact that the funds at issue were subject to reversion directly to the employer. That is a *per se* conflict.

There also were major procedural irregularities, as discussed above, which reaffirm that the determination at issue was arbitrary and capricious. Defendants admitted that SERP I designated no "Plan Administrator" as such (Fact Statement ¶ 8), yet filed reports with the Department of Labor designating B&L as Plan Administrator (Fact Statement ¶ 9). None of the B&L witnesses involved admitted to having made the adverse benefit determination at issue. Whoever did make the decision ignored the consultant opinions from Mercer and Westport, and ignored SERP I § 12, which prevented reducing the benefits of vested Participants, all while no one with discretionary authority under SERP I even was involved. Fact Statement ¶ 27. The Committee designated to review the adverse benefit determination in 2008 also had numerous failings, including complete delegation of its reasoning and preparation of decisions to its law firm, not having any evidence of its deliberations or what it reviewed, failing to consider the purpose or context for SERP I, and failing to obtain either of the consultant opinions or consider

them or other context for the decision.  Fact Statement ¶¶ 28-31.  These numerous procedural

irregularities make it highly likely that defendants' conflict of interest affected their decisions.

Accordingly, the Court should give the conflict here "great importance," *see Glenn,* 128 S. Ct. at

2351, and should conclude in light of it and all of the other evidence, that defendants' decisions

were arbitrary and capricious.

## **CONCLUSION**

For the foregoing reasons, summary judgment should be granted in favor of plaintiffs

determining, as a matter of law, that defendants breached their obligations to pay benefits

required under the Bausch & Lomb Supplemental Retirement Income Plan I, including the

monthly payments from October 1, 2007 forward, and that defendants are obligated to pay

plaintiffs the full amounts they were entitled to receive, together with interest, costs, and

plaintiffs' reasonable attorneys' fees incurred in pursuing this action.

Dated:  April 16, 2012

Respectfully submitted,


_____s/_____

Harold A. Kurland (hkurland@wardgreenberg.com)
Heidi S. Martinez (hmartinez@wardgreenberg.com)
Taren N. Greenidge (tgreenidge@wardgreenberg.com)
*Attorneys for Plaintiffs*
WARD GREENBERG HELLER & REIDY LLP
300 State Street
Rochester, New York 14614
(585) 454-0700