UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DANIEL E. GILL, et al.,

                          Plaintiffs,

        v.

BAUSCH & LOMB SUPPLEMENTAL
RETIREMENT INCOME PLAN I, et al.,

                          Defendants.
_____

<u>DECISION & ORDER</u>

09-CV-6043CJS

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Charles J. Siragusa, United States District Judge, dated

September 30, 2009, all pretrial matters in the above-captioned case have been referred to this

Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 27).

Plaintiffs Daniel Gill, Thomas McDermott and Jay Holmes have filed this action

against defendants Bausch & Lomb Supplemental Retirement Income Plan I, Bausch & Lomb,

Inc., and the Compensation Committee of the Bausch & Lomb Board of Directors, under the

Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.*

("ERISA").  (Docket # 1).  Plaintiffs, retired senior officers of Bausch & Lomb, Inc. ("B&L"),

allege that defendants unlawfully reduced their vested benefits in B&L's Supplemental

Retirement Income Plan I ("SERP I" or the "Plan") when B&L was acquired by another

company.  Specifically, plaintiffs challenge B&L's issuance at that time of lump sum payments

to each of them, which they contend were less than the present value of the benefits to which they

were entitled.

On September 29, 2009, Judge Siragusa issued a decision granting in part and denying in part defendants' motion to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Docket # 24).  Following the dismissal of Count Two, plaintiffs' sole remaining claim is one for wrongful reduction of benefits under 29 U.S.C. § 1132(a)(1)(B).  (*Id*.).

Pursuant to this Court's scheduling orders, the parties have engaged in discovery, the scope of which has spawned many disputes and two motions to compel, including the pending motion.  (Docket ## 33, 53).  Fact discovery formally concluded on February 29, 2012, and both parties have since filed motions for summary judgment, which are pending before the district court.  (Docket ## 47, 55, 56).

## FACTUAL BACKGROUND

### I.  The SERP I Plan[1]

In the 1980s, B&L created the SERP I pension plan in order to recruit and retain senior executives.  (Docket # 1 at ¶¶ 27-29).  The Plan required B&L to establish and maintain a separate, irrevocable trust for each participant and to fund each trust with periodic contributions. (*Id*. at ¶¶ 30-31).  Under the Plan, each participant was to receive annual after-tax benefits of up to 36% of the participant's "Final Average Compensation" (as defined by the Plan) paid in equal monthly installments over the course of the participant's life.  (*Id*. at ¶ 35).  The Plan further provided that following a participant's death, his or her surviving spouse was to receive 50% of such benefits for life.  (*Id*. at ¶ 36).  Each trust agreement contained a provision authorizing the

---

[1]  This section describing the SERP I Plan is taken, with minor modifications, from my previous decision dated June 10, 2011, addressing a prior discovery dispute.  (*See* Docket # 45).

2

trustee to pay B&L any excess assets remaining in the trusts after final payment to the participants and their surviving spouses under the Plan.  (*Id*. at ¶ 33; Docket # 37-5 at 69).

Plaintiffs are former B&L senior executives and were the only three participants in SERP I.  Plaintiff Gill retired in 1996; plaintiff McDermott retired in 1993; and, plaintiff Holmes retired in 1997.  (Docket # 1 at ¶¶ 38-40).  Following retirement, each plaintiff began receiving monthly benefits under SERP I.

In May 2007, B&L announced its agreement to sell its outstanding shares of common stock to Warburg Pincus, a private equity firm.  (*Id*. at ¶ 42).  On September 19, 2007, B&L's Vice-President for Compensation and Benefits, Laurie Zaucha ("Zaucha"), wrote to plaintiffs to advise them that shareholder approval of the Warburg acquisition would trigger the "change in control" provision in the Plan, pursuant to which their monthly payments would be converted into one-time lump sum payments and their rights in the Plan would be terminated. (*Id*. at ¶¶ 43, 45).  On September 21, 2007, B&L's shareholders voted to approve the acquisition, and, on September 24, 2007, B&L directed the trustee to cease the monthly payments and to await further instructions regarding the issuance of lump sum payments to each of the plaintiffs. (Docket # 56-1, Ex. N).  On October 3, 2007, B&L directed the trustee to deposit the lump sum amounts for payment on October 5, 2007.  (Docket # 1 at ¶¶ 46, 47).  Despite plaintiffs' objections that the projected payments understated the present value of the benefits to which they were entitled, the proposed lump sum payments to plaintiffs were made on October 5, 2007.  (*Id*. at ¶¶ 50, 52).

That same day, plaintiffs' attorney Harold Kurland, Esq., who represents them in this litigation, wrote to B&L objecting to the discontinuance of the monthly payments and

contesting the amount of the lump sum payments.[2]  (Docket # 53-1 at ¶ 19, Ex. L).  Plaintiffs

further contended that the Plan explicitly provided for the trusts to survive any change in control

of B&L.  (Docket # 1 at ¶ 51).  B&L responded that it was reviewing their claims and would

contact them "to set up a process for providing information."  (*Id*. at ¶ 53).

On November 1, 2007, B&L advised plaintiffs that in order to challenge the

benefit payments, they were required to file a claim with the Board's Committee on

Management.  (*Id*. at ¶¶ 55, 58).  B&L further advised that it intended to establish a new Board of

Directors, which would appoint a new committee to assume the responsibilities of the Committee

on Management.  (*Id*. at ¶ 60).  Plaintiffs contend, however, that at the time of this

communication, no Committee on Management or "written claim review procedure" in fact

existed.  (*Id*. at ¶¶ 56-57, 59).

On November 21, 2007, the Board appointed the Compensation Committee and

vested it with responsibility for all determinations concerning SERP I.  (Docket # 37-9 at 2-5).

On November 28, 2007, plaintiffs wrote to the Board's "Committee on Management or

Successor Committee" to contest the adequacy of the lump sum payments and to request that the

committee remedy the deficiency (the "November 28, 2007 Claim").  (Docket ## 37-3 at 64-66;

1 at ¶ 63).  On January 2, 2008, B&L's current Chairman and CEO advised plaintiff Holmes that

B&L and its "advisors" had reviewed the benefits determination and had referred the matter to

the Compensation Committee.  (Docket # 1 at ¶ 64).  The Compensation Committee retained the

law firm of Ropes & Gray LLP to advise it in connection with the determination of plaintiffs'

---

[2]  In an affidavit submitted in connection with the pending motion, Kurland represents that his firm became "involved" in the matter on October 4, 2007 and was retained the following day.  (Docket # 53-1 at ¶ 19).

claims, and Ropes & Gray handled all communications on behalf of the committee.  (Docket # 56-1 at ¶ 52).

Following submissions to the Compensation Committee by plaintiffs, through Mr. Kurland as counsel, and B&L, through Proskauer Rose LLP ("Proskauer") as counsel, on April 14, 2008, plaintiffs were informed that their claims for benefits had been denied.  (Docket # 1 at ¶ 74; Docket # 56-1 at ¶¶ 49, 53).  The letter was signed by counsel for the Compensation Committee, Jonathan M. Zorn, Esq. of Ropes & Gray LLP, who stated that he was acting on behalf of the Plan administrator.  (Docket # 56-1, Ex. V).  The Compensation Committee subsequently denied plaintiffs' appeal of that decision on December 11, 2008.  (Docket ## 1 at ¶¶ 75-78; 56-1 at ¶ 55, Ex. X).


## II.  **The Pending Motion**

Currently pending before this Court is plaintiffs' motion to compel disclosure of certain documents that defendants have withheld as privileged.  (Docket # 53).  At issue is the applicability and scope of the fiduciary exception to the attorney-client privilege.  Plaintiffs maintain that the withheld documents fall within that exception and must be produced to plaintiffs – ERISA beneficiaries to whom B&L, as Plan sponsor and administrator, owed a fiduciary duty.  Defendants counter that the withheld documents reflect advice provided by counsel to B&L in anticipation of litigation with plaintiffs and fall outside the ambit of the fiduciary exception.  The documents at issue are communications between B&L employees, on the one hand, and attorneys with Proskauer or B&L in-house attorneys, on the other.

Plaintiffs' request for disclosure of communications between counsel and B&L representatives has been the subject of protracted negotiations between counsel and many discovery conferences with the Court.  Those endeavors to minimize full-blown discovery motions resulted in an agreement by B&L to produce all communications between (1) defendants and the law firm of Nixon Peabody LLP, which provided advice to B&L on the administration of the Plan and (2) defendants and the law firm of Ropes & Gray LLP, which provided advice to B&L's Board of Directors' Compensation Committee that was formed in November 2007 to review plaintiffs' claims and their subsequent appeal.

Defense counsel also prepared a privilege log to identify withheld communications between B&L employees and Proskauer attorneys during the period September 24, 2007 through October 12, 2007.  As agreed by the parties, defendants submitted the logged documents to me for *in camera* review.  During a conference call with counsel on February 17, 2012 to discuss the review, I requested supplemental letters to assist me in my review and determination.  On February 27, 2012, counsel advised me by letter that they had resolved the dispute.  (Docket # 53-1, Ex. U).  After learning of the parties' compromise, the Court returned to defense counsel the documents that had been submitted for *in camera* review.

Defendants also withheld from production communications between B&L employees and attorneys in B&L's in-house legal department.  Those communications were apparently also logged and submitted to the Court for *in camera* review.

Unfortunately, the negotiated compromise did not resolve the dispute.  On March 7, 2012, counsel for plaintiffs sent a letter to this Court advising that one of the documents that defendants had produced pursuant to the compromise demonstrated that the scope of Proskauer's

representation had extended beyond providing advice in anticipation of the litigation and had encompassed fiduciary matters, such as interpreting the Plan and calculating plaintiffs' lump sum benefits.  (*Id.*, Ex. AA).  I directed plaintiffs to file a formal motion to compel if they wished to pursue disclosure of the withheld documents.  (Docket # 52).

The pending motion was filed on April 12, 2012, and oral argument was heard on May 2, 2012.  (Docket ## 53, 60).

For the reasons discussed below, I grant plaintiffs' motion in part and deny it in part.

## DISCUSSION

### I.  The Fiduciary Exception

The purpose of the fiduciary exception to the attorney-client privilege is to permit ERISA beneficiaries to review communications between a plan's administrator and counsel about matters as to which the plan's beneficiaries are owed a fiduciary duty.  *In re Long Island Lighting Co.*, 129 F.3d 268, 271-72 (2d Cir. 1997).  Two rationales underlie the doctrine:  first, that the "fiduciary exception" is actually "an extension of the [attorney-client] privilege to the beneficiary, who by virtue of the administrator's fiduciary duty is the true client of the attorney providing the advice"; alternatively, that the doctrine represents "a true exception to the attorney-client privilege, arising from the duty to disclose information concerning plan administration to plan beneficiaries."  *Black v. Bowes*, 2006 WL 3771097, *2 (S.D.N.Y. 2006).  *See also United States v. Mett*, 178 F.3d 1058, 1063 (9th Cir. 1999).

Application of the fiduciary exception turns on the purpose of the communication at issue. *In re Long Island Lighting Co.*, 129 F.3d at 271.  If the communication concerns "a matter as to which the employer owe[s] a fiduciary obligation to the beneficiaries," the fiduciary exception will apply; if not, the attorney-client privilege will remain intact.  *Id*.  An employer acts in a fiduciary capacity towards a plan's beneficiaries in matters of "plan management or administration, [but] not in the plan's design[,] amendment" or termination.  *Id*. at 271, 272 (citing *Everett v. USAir Group, Inc.*, 165 F.R.D. 1, 4 (D.D.C 1995)).

Where counsel provides advice to an employer on both fiduciary and non-fiduciary matters, "the privileged consultation on non-fiduciary matters does not defeat the fiduciary exception that allows beneficiaries to discover the otherwise privileged communications on fiduciary matters." *Id*. at 272 (emphasis omitted).  In other words, where the attorney acts on behalf of both the employer and the beneficiaries – such as, in matters of plan administration and management – the beneficiaries are entitled to disclosure of communications between counsel and the employer.  *Id*. at 273.  The beneficiaries are not entitled, however, to disclosure of their communications on non-fiduciary matters even if the employer and counsel have also communicated about fiduciary matters.  *Id*.

In determining the purpose of the communication, courts often place significant emphasis on whether the communication occurred before or after "the challenged benefits determination took place."  *Black v. Bowes*, 2006 WL 3771097 at *3.  *See*, *e.g.*, *Asuncion v. Metro. Life Ins. Co.*, 493 F. Supp. 2d 716, 720 (S.D.N.Y. 2007) ("[f]requently, the key question is whether the communication was made before or after the final decision to deny benefits"); *Bell v. Pfizer Inc.*, 2006 WL 2529762, *7 (S.D.N.Y. 2006) ("the fiduciary exception does not extend

8

to documents . . . [that] pertain to communications that occurred after [employer's decision to deny plaintiff retirement status]"). Courts have reasoned that the distinction is important because "[t]here should be little need for administrators to consult counsel regarding a specific benefits determination after that benefits determination is made." *Black*, 2006 WL 3771097 at *3. While that inquiry is not dispositive, it properly "centers on whether the purpose of the communications was legal advice regarding the legal liability of plan administrators in imminent or pending litigation, as opposed to advice concerning a general fear of liability or advice concerning plan administration itself." *Id.*

## II.  Analysis

### A.  Attorney-Client Privilege

Throughout discovery, defendants have consistently maintained that Proskauer was retained in anticipation of litigation after B&L's interests "diverged" from plaintiffs' interests and that Proskauer rendered advice only on non-fiduciary matters. (*See* Document # 53-1, Exs. J, R, T, BB). Defense counsel's letter to this Court accompanying its submission of documents for *in camera* review summarized their position:

> Unlike the other firms involved in this matter, Nixon Peabody and
> Ropes & Gray, Proskauer was engaged by B&L, in its settlor
> capacity as litigation counsel to defend B&L against the claims
> brought by Messrs. Gill, Holmes, and McDermott.  Accordingly,
> the fiduciary exception does not apply to any communications
> between B&L and Proskauer in this matter.

9

(*Id.*, Ex. T at 5).  In that letter, counsel represented that in-house counsel also reasonably anticipated litigation after September 2007 and thus acted in a non-fiduciary capacity during the post-September 2007 period.  (*Id.*).

      At the time of that submission, defendants' characterization of Proskauer's role appeared to be supported by an October 1, 2007 email that was included among the documents provided to the Court.  The email communication was sent by Zaucha[3] to an attorney with Proskauer and stated that B&L was retaining Proskauer in connection with the dispute with plaintiffs; a member of B&L's in-house department, Robert Bailey, Esq. ("Bailey"),[4] was copied on the email.  (*See* Docket # 53-1, Ex. K at 3).  Indeed, I noted the engagement email to plaintiffs' counsel during the February 17, 2012 conference.  (Docket # 63).  Shortly after the conference, I was advised by counsel for the parties that they had negotiated a resolution of the dispute and no longer needed me to review the documents.  (Docket # 53-1, Ex. U).

      Pursuant to the negotiated compromise, defense counsel produced to plaintiffs' counsel various previously-withheld documents, including a September 28, 2007 email from Zaucha to Bailey.  That email reflects Zaucha's proposed changes to a draft letter to plaintiff Gill's financial advisor, Patrick Martin, who had questioned the methodology that B&L had proposed to calculate plaintiffs' distributions; the final version of the letter was dated October 2, 2007, signed by Zaucha and sent to Martin.[5]  The October 2 letter states, in relevant part:

---

[3]  As stated *supra* at 3, Zaucha was employed by B&L as its Vice-President for Compensation and Benefits.

[4]  Mr. Bailey subsequently became B&L's General Counsel.  (Docket # 53-1 at ¶ 32).

[5]  No dispute exists that the October 2 letter had been previously produced during discovery.  (Docket # 53-1, Ex. W).

> The lump sum payout methodology has been reviewed internally,
> and has also been reviewed with the Company's regular outside
> benefits counsel, with two actuarial firms, and with an external
> non-qualified benefits expert, who all agree with the calculation
> methodology. . . .   Recently, you have suggested that the interest
> rate used in calculating the lump sum benefit under Section 13 of
> the Plan should also be tax-affected in order to provide for a tax
> gross-up on earnings from the principal amount of the after tax
> lump sum after payment.   This suggestion is not provided for in the
> Plan.   In light of, and in order to carefully consider, your
> suggestion, *we have re-reviewed the methodology and Plan
> interpretation with the third parties referenced above, and we have
> also engaged another outside benefits lawyer for a further
> assessment of the matter.   The original methodology has been
> confirmed.*

(Docket # 53-1, Ex. W (emphasis added)).   The previously-withheld Zaucha email reveals that

the unnamed other "outside benefits lawyer" referred to in the October 2 letter was in fact

Proskauer.   (Docket # 53-1, Ex. V).

Plaintiffs contend that this disclosure of Proskauer's role in "assess[ing] the

matter" refutes defendants' position that Proskauer's only role was to provide advice in

anticipation of litigation – a position which plaintiffs' counsel represents he had accepted for

purposes of negotiating the February compromise.   I agree.   The October 2 letter, read in

conjunction with the September 28 draft, reveals that B&L sought Proskauer's advice on the

same issues as to which it had consulted "regular outside benefits counsel, . . . two actuarial

firms, and . . . an external non-qualified benefits expert" – namely, whether the interest rate used

in the calculation of the lump sum benefit amount should be "tax-affected" in order to provide an

earnings "gross-up."   (Docket # 53-1, Ex. W).   The letter itself characterizes this question as one

of "methodology and Plan interpretation."   (*Id.*).

11

Applying the authority cited above, I find that the issues on which B&L consulted Proskauer fell within B&L's fiduciary responsibilities to plaintiffs.  The issues concerned matters of both plan interpretation and administration – determining whether the Plan required application of a tax-affected interest rate (a question on which the Plan was apparently silent) and determining the appropriate methodology to calculate the lump-sum payments.  *See*, *e.g.*, *Edwards v. Wilkes-Barre Pub. Co. Pension Trust*, 757 F.2d 52, 57 (3d Cir.) (upholding trustees' method of calculating benefits as reasonable interpretation of plan), *cert. denied*, 474 U.S. 842 (1985); *Everett v. USAir Group, Inc.*, 927 F. Supp. at 483 (whether dividends were to be included when calculating plan benefits was a matter of interpreting the collective bargaining agreement and pension plan); *Ret. & Sec. Program for Emps. of Nat'l Rural Elec. Coop. Assoc. v. Oglethorpe Power Corp. Ret. Income Plan*, 712 F. Supp. 223, 230 (D.D.C. 1989) (selection of actuarial methodology was "committed to the discretion of the plan administrator").  *Cf. Geller v. Cnty. Line Auto Sales, Inc.*, 86 F.3d 18, 21 (2d Cir. 1996) (calculation of benefits is a ministerial function not involving discretion); *Fitch v. Chase Manhattan Bank, N.A.*, 64 F. Supp. 2d 212, 229 (W.D.N.Y. 1999) (defendant did not act as a fiduciary where "figuring of the plaintiffs' ERISA benefit estimates pursuant to the terms of the plan was a mathematical calculation that did not require the exercise of discretion"); *MacMillan v. Provident Mut. Life Ins. Co. of Phila.*, 32 F. Supp. 2d 600, 606 (W.D.N.Y. 1999) (no discretion where plan set forth "precise formula" for determining amount of benefits).  *See also Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993) ("Fiduciaries are assigned a number of detailed duties and responsibilities, which include the proper management, administration, and investment of plan assets, the maintenance of proper

records, the disclosure of specified information, and the avoidance of conflicts of interest")
(internal quotation and bracket omitted).

Defendants maintain that the functions were not fiduciary, but "ministerial" in
nature and were undertaken by B&L employees (namely, Zaucha) who had no discretionary,
fiduciary responsibilities to interpret or administer the Plan.[6]  (*See* Docket # 58 at 6, 10-11).  To
the contrary, Zaucha herself testified that she had responsibility for administering the Plan.
(Docket # 58-1, Ex. 9 at p.18).  She characterized her duties to include reviewing documents "to
determine what the [c]hange in [c]ontrol required for each plan, and then [to] carry out what the
[p]lan directed us to carry out."  (*Id.*).  Whether or not the terms of the Plan expressly vested
Zaucha with these responsibilities does not determine whether she, in fact, acted in a fiduciary
capacity.  *See Mertens v. Hewitt Assoc.*, 508 U.S. at 251 ("[ERISA] statute provides that not only
the persons named as fiduciaries by a benefit plan . . . but also anyone else who exercises
discretionary control or authority over the plan's management, administration, or asserts . . . is an
ERISA 'fiduciary'").  Considering her testimony about her responsibilities, the nature of her
communications with plaintiffs and their representatives and the absence of any evidence that
someone else in fact made the lump-sum payout determinations, I find that Zaucha acted in a
fiduciary capacity.

Defendants' contention that the issues referenced in the Zaucha letter were merely
"ministerial" is undercut by B&L's recognition that they were sufficiently complex to require

_____

[6]  The Plan named two administrators:  the Vice-President of Human Resources and the Committee on
Management.  (Docket # 55-3, Ex. 3).  This Court is not aware of any evidence that exists in the record that B&L's
Senior Vice-President of Human Resources (apparently, there was no "Vice-President of Human Resources" at the
time) or B&L's Management Committee made any decisions relating to the lump-sum payouts to plaintiffs.

review by two different benefits counsel, two actuarial firms and an external non-qualified

benefits expert.  Moreover, B&L itself characterized the review as encompassing not only

methodology, but "Plan interpretation."  That characterization can hardly be attributed to careless

draftsmanship considering that the term is entirely absent from the September 28 draft, which

simply stated, "we have re-reviewed the calculation with the third parties referenced above."  The

final version was modified to provide, "we have re-reviewed the methodology *and Plan*

*interpretation* with the third parties referenced above."  (Docket # 53-1, Ex. W (emphasis

added)).  Finally, it bears noting that defendants did not assert the "ministerial function"

argument to resist production of communications with the other benefits counsel referenced in

the letter.  Considering that Proskauer apparently assessed the same issues as that counsel and

"confirmed" the "original methodology," no principled basis exists to withhold the Proskauer

communications.

     Indeed, B&L not only obtained Proskauer's advice on plan interpretation and

benefits calculation methodology, but it also asserted that advice to explain its determination to

the beneficiaries.  Under settled ERISA law, the beneficiaries are entitled to disclosure of

communications between the employer and counsel that reflect and concern that advice.  Even if

Proskauer provided that advice with an awareness of the possibility of future litigation, the

communications still must be produced.  *See, e.g.*, *Asuncion v. Metro. Life Ins. Co.*, 493

F. Supp. 2d at 722 ("mere prospect of litigation is not enough to render communications between

fiduciaries and counsel privileged because the prospect of litigation is always present in decisions

about whether to grant or deny benefits") (internal quotation omitted); *Black*, 2006 WL 3771097

at *3 ("courts have properly rejected the view that a mere awareness of the possibility of

post-decisional litigation or desire to avoid such litigation is enough to justify applying the fiduciary exception").  At that time, although Gill's financial advisor had questioned B&L's planned methodology, Gill had neither threatened litigation, nor retained an attorney; indeed, the payments had not yet occurred.  *See Bell v. Pfizer Inc.*, 2006 WL 2529762 at *7 n.9.

Even under traditional attorney-client waiver principles, plaintiffs are entitled to disclosure of B&L's communications with Proskauer that comprise the advice B&L asserted and relied on in Zaucha's letter.  Zaucha disclosed the subject of Proskauer's advice in her October 2 letter in order to assure Gill that B&L had consulted counsel on the issues of plan interpretation and methodology and had "confirmed . . . the original methodology."  Defendants' disclosure of Proskauer's advice – that B&L's methodology was proper – waives any attorney-client privilege that would otherwise attach to the communications irrespective of the fiduciary exception.  *See*, *e.g.*, *United States v. Jacobs*, 117 F.3d 82, 91 (2d Cir. 1997) (disclosure of substance of privileged communication waives the privilege) (citing *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469 (S.D.N.Y 1996)); *Tracy v. NVR, Inc.*, 2011 WL 2418632, *2 (W.D.N.Y. 2011) (finding waiver where company disclosed in letter to employees that counsel had advised that the company's policies "conform to long-standing Department of Labor Guidelines"; citing cases).

In sum, I find that (1) Proskauer's representation of B&L during the September - early October 2007 period went beyond simply providing advice in connection with the possibility of litigation; (2) Proskauer's representation included providing advice to B&L on fiduciary matters of plan interpretation and administration; and, (3) Proskauer asserted that advice to plaintiffs, the Plan beneficiaries, in order to explain the lump sum payout

15

determinations.  Under these circumstances, defendants must disclose their communications with

Proskauer attorneys that reflect or relate to this advice.

Much of the authority discussed *supra* provides that the date of the adverse

benefits decision often establishes a reasonable and practical endpoint to the period of mandated

disclosure.  *See, e.g., Black*, 2006 WL 3771097 at *3; *Asuncion*, 493 F. Supp. 2d at 720; *Bell*,

2006 WL 2529762 at *7.  In this case, that occurred on October 5, 2007, when the payments

were deposited into plaintiffs' accounts.  That was also the date on which plaintiffs' counsel,

who had been retained the previous day, apparently first communicated with B&L in-house

counsel about the distributions.  Using this framework, I direct B&L to produce copies of its

communications with Proskauer through October 5, 2007.  B&L shall also produce

communications during that period with in-house attorneys who had no more reason than

Proskauer to reasonably anticipate litigation at that time.  *See, e.g., Asuncion*, 493 F. Supp. 2d at

721-22 (applying fiduciary exception to communication with in-house counsel); *Anderson v.

Sotheby's Inc. Severance Plan*, 2005 WL 6567123, *11 (S.D.N.Y. 2005) (same).  If any

communications occurred during that period that defendants believe concerned non-fiduciary

matters – as I have defined and applied that term – they must provide a copy of the

communication to this Court for *in camera* review and determination.  Based on the record as it

has been developed, however, I anticipate that very few, if any, communications will fall outside

the fiduciary exception.

Plaintiffs request disclosure extending beyond October 5, 2007, however;

specifically, they seek production of all communications with Proskauer and with in-house

counsel on fiduciary matters involving plaintiffs' claims for benefits up through the December

16

2008 date on which B&L's Compensation Committee denied plaintiffs' appeal. (*See* Docket # 53-3 at 1-2). I do not believe that the record justifies such broad disclosure. The parties agree that when the Compensation Committee (the "Committee") was formed in November 2007 and vested with authority to determine plaintiffs' claims, the Committee retained its own counsel, Ropes & Gray LLP, to advise it on the claims. The Committee's communications with Ropes & Gray have been produced. In addition, throughout the claims process before the Committee, plaintiffs were represented by Mr. Kurland, the same attorney who subsequently commenced this action and continues to represent them, and B&L was represented by Proskauer, the same firm which has defended this action from the beginning. Both counsel provided the Committee with written statements reflecting their clients' positions. The Committee's rejection of plaintiffs' claims and subsequent denial of their appeal were communicated to Mr. Kurland by letters from Mr. Zorn, an attorney with Ropes & Gray.

Under these circumstances, I agree with defendants that Proskauer ceased advising B&L on fiduciary matters when the Committee retained Ropes & Gray and began its review of plaintiffs' claims. *See Allen v. Honeywell Ret. Earnings Plan*, 698 F. Supp. 2d 1197, 1203 (D. Ariz. 2010) (documents may not be subject to fiduciary exception if they were "generated by *separate* legal counsel during the administrative claims process [and . . .] involved possible litigation") (emphasis in original). Had Proskauer acted to advise both the Committee, as Plan administrator, and B&L, as employer, during the claims process, disclosure would likely be warranted. Despite lengthy discovery, however, plaintiffs have adduced no evidence that Ropes & Gray was counsel in name only, and that Proskauer actually advised the Committee. In short, because (1) plaintiffs had communicated their objections to B&L's plan methodology and

17

interpretation and defendants had considered and rejected those objections before the distributions were made; (2) both parties had retained counsel to represent their positions before the Committee; and, (3) the Committee had retained its own separate counsel to advise it and communicate with the parties, I conclude that Proskauer cannot reasonably be viewed to have acted in a fiduciary capacity to the plaintiffs during the time that their claims were before the Committee.  Accordingly, I deny plaintiffs' motion to compel disclosure of communications during that period.

This determination leaves open the question of disclosure of the requested communications during the period between October 6, 2007 and the Committee's retention of Ropes & Gray.  Because the record is unclear as to the subject or scope of communications during that period between B&L and Proskauer, and B&L and in-house counsel concerning the lump sum distributions to plaintiffs, I direct defendants to prepare a privilege log of those communications and to produce that log to plaintiffs.  Defendants are further directed to submit the withheld communications and privilege log to me for *in camera* review.

## B.  **Work Product Doctrine**

In a two-paragraph section at the end of their fourteen-page brief, defendants invoke the attorney work product doctrine as an alternative basis for non-disclosure of the Proskauer communications.  (Docket # 58 at 14).  In order to assert the attorney work product privilege, a party "must be able to show that the documents were prepared (1) 'in anticipation of litigation' (2) by a party or its representative and (3) not in the ordinary course of business." *Ricoh Co., Ltd. v. Aeroflex Inc.*, 219 F.R.D. 66, 68 (S.D.N.Y. 2003).  Whether the fiduciary exception also applies to attorney work product is an unsettled question in this Circuit. *Compare*

*Lugosch v. Congel*, 219 F.R.D. 220, 243 (N.D.N.Y. 2003) (in non-ERISA case, fiduciary

exception does not extend to work product doctrine because "the work product belongs to the

litigator not the litigant fiduciary and it is the lawyers' impressions, strategies, and theories, the

law is attempting to guard") *with Anderson v. Sotheby's Inc. Severance Plan*, 2005 WL 6567123

at *9 (redacting settlement numbers from communication, but observing that allowing the work

product doctrine to defeat the fiduciary exception in ERISA cases would swallow the purpose of

the fiduciary exception; otherwise "no ERISA plan beneficiary could ever obtain discovery into

records of an [a]dministrator's investigations of the claim because an administrator could almost

always claim that it anticipated possible litigation") (internal quotation omitted).

      In any event, the party asserting the privilege bears the burden of establishing it.

*In re Application of Minebea Co., Ltd.*, 143 F.R.D. 494, 499 (S.D.N.Y. 1992).  *Ipse dixit*

assertions or unsupported conclusions are insufficient to establish the privilege.  *E.E.O.C. v.*

*Johnson & Higgins, Inc.*, 1998 WL 778369, *4 n.4 (S.D.N.Y. 1998) (attorney's conclusory

statement that documents reflected the attorney's "thoughts, impressions and strategies" and were

therefore protected was insufficient to establish work product protection) (citing *In re Grand*

*Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224-25 (2d Cir. 1984)).

      Here, defendants have not established any of the elements demonstrating

entitlement to work product protection.  At most, their brief contains one sentence asserting that

"B&L initially contacted Proskauer for two purposes:  (i) to provide advice about B&L's

potential liability for benefit miscalculations, and (ii) to outline the company's best defenses

against this litigation."  (*Id.*).  Unaccompanied by any sworn affidavits or specific factual

assertions, this conclusory statement is insufficient to justify the blanket application of the work

produce protection that defendants seek.[7]  *See, e.g.*, *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 474 (2d Cir.) (deficient privilege log was inadequate to establish work product protection, "particularly in the glaring absence of any supporting affidavits or other documentation"), *cert. denied*, 519 US. 927 (1996); *Sec. & Exch. Comm'n v. Beacon Hill Asset Mgmt.*, 231 F.R.D. 134, 143-44 (S.D.N.Y. 2004) (work product protection not established where party asserted no factual information regarding the circumstances under which the documents were prepared); *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 474 (S.D.N.Y. 1993) ("if the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege, his claim will be rejected").  Accordingly, I find that defendants have not met their burden of establishing that the withheld communications are protected as attorney work product.

---

[7]  Indeed, as discussed *supra* in connection with the attorney-client privilege, the Zaucha email communication cannot be said to have been created in anticipation of litigation, rather than in connection with B&L's fiduciary responsibility to the Plan beneficiaries to interpret the Plan in order to determine the proper methodology for calculating the plaintiffs' lump-sum payouts.  *See Tankleff v. Cnty. of Suffolk*, 2011 WL 5884218, *3 (E.D.N.Y. 2011) ("[a]lthough the mere possibility of future litigation is insufficient to invoke the privilege, the party seeking protection need only show that 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation'") (quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (emphasis in original)).

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs' motion to compel **(Docket # 53)** is

**GRANTED in PART** and **DENIED in PART**.  Defendants shall comply with the directives

herein by no later than **June 26, 2012**.

**IT IS SO ORDERED.**

_s/Marian W. Payson_

MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      June   12  , 2012