UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

────────────────────────────

DANIEL E. GILL, THOMAS C.
McDERMOTT, and JAY T. HOLMES,

                Plaintiffs,

     -vs-

BAUSCH & LOMB SUPPLEMENTAL
RETIREMENT INCOME PLAN I, BAUSCH &
LOMB INCORPORATED, and COMPENSATION
COMMITTEE OF THE BAUSCH & LOMB
BOARD OF DIRECTORS,

                Defendants.

**DECISION AND ORDER
No. 6:09-CV-6043(MAT)**

────────────────────────────

## I.   Introduction

Daniel E. Gill ("Gill"), Thomas C. McDermott ("McDermott"), and Jay T. Holmes ("Holmes") (hereinafter, collectively, "Plaintiffs") are retired Bausch & Lomb Incorporated ("B&L") executives and are the sole participants in the Bausch & Lomb Supplemental Retirement Income Plan I ("the Plan" or "SERP I"). Represented by counsel, Plaintiffs instituted this action pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, et seq. ("ERISA"), challenging Defendants' termination of their monthly benefits pursuant to the Change of Control Provision of SERP I and calculation and distribution of their supplemental retirement benefits as lump sums. Plaintiffs and Defendants have filed competing motions for summary judgment, which presently are pending before this Court.

## II.   Background

### A.   The Plan Document[1]

SERP I is an executive deferred compensation plan enacted to provide supplemental retirement benefits to its vested Participants: Gill, McDermott, and Holmes. Plaintiffs are the only individuals named in the Plan, and their rights vested before the effective date of the current version of SERP I, restated on December 18, 1990. The Plan defines the terms "Participant" and "Retired Participant" as follows: "Participant means an employee of the Company who has been selected to participate in the Plan pursuant to Section 4." Plan, § 2(f). "Retired Participant means a former Participant who is receiving benefits under this Plan." Id., § 2(h). All three individual plaintiffs were retired and receiving benefits under SERP I prior to the dates on which the relevant decisions were made.

The Plan states that it "shall be administered by the Vice President of Human Resources of [B&L], or by such other employees as the Committee may from time to time designate." Plan, § 3. "Committee" is defined as the "Committee on Management of the Board of Directors." Id., § 2(a). The Plan provides that, subject to provisions not at issue here, "the Committee shall have authority

---

[1]

The Plan is attached as Exhibit ("Ex.") A to the Affidavit of Harold A. Kurland, Esq. ("Kurland Aff.") and Ex. 3 to the Affidavit of Nicole Eichberger ("Eichberger Aff."). Exhibits referred to by letter are attached to the Kurland Aff.; exhibits referred to by number are attached to the Eichberger Aff.

and discretion to . . . interpret the Plan, and make all determinations deemed necessary or desirable for the administration of the Plan." Id., § 3.

The Plan's Change of Control ("COC") provision states in relevant part as follows:

> Upon a Change of Control (as defined below), each Participant shall be fully vested in the benefit set forth in section 5 hereof . . . . [S]uch benefit (assuming commencement at age 55 or such greater age as is then attained by the Participant) shall be converted to a cash lump sum and paid within 15 days following the Change of Control utilizing for this purpose the same actuarial assumptions as are utilized in the Bausch & Lomb Retirement Benefits Plan. . . . The Plan and its associated trusts shall continue in effect and survive any Change of Control and any successor to the Company shall assume the obligations of the Company under the Plan.

Ex. A, BL-AR 002065.

## B.   The Merger and the Decision to Terminate Benefits

In May 2007, B&L announced its agreement to sell its outstanding shares of common stock to Warburg Pincus, LLC ("Warburg"), a global private equity firm. In preparation for the anticipated shareholder approval, B&L Human Resources personnel, including Vice President of Compensation and Benefits Laurie Zaucha ("Zaucha") and Senior Benefits Analyst Christopher Reigle ("Reigle"), analyzed B&L's various benefit plans to determine whether they contained COC provisions that would be triggered by a shareholder vote approving the merger. SERP I was identified as one of the plans containing such a COC provision. Reigle discussed the

COC provisions in SERP I and other benefit plans issued by B&L with Todd E. Weber ("Weber") of Mercer Human Resource Consulting ("Mercer"), specifically, the issue of whether inactive Participants would receive lump sumps following a COC. See Ex. K, BL-LIT 000865-868 (Letter from Weber to Reigle; cc: to Zaucha). Weber noted that

> the purpose of a change in control provision is to ensure continued employment and objectivity of senior executives prior to a potential change in control, notwithstanding any risks or uncertainties created by the possible change in control. This is done by paying benefits in a lump sum upon a change in control-benefits that would otherwise be payable only if the executives terminated employment. . . .

Ex. K, BL-LIT 000865. In Weber's opinion, "[s]ince the change in control provision specifically references 'Participants', and not 'Retired Participants', it appears the three retires [sic] would not receive lump sum distributions upon a change in control." Id., BL-LIT 000866. Weber observed that even "if it is determined that the change in control provisions do not permit, or require lump sum payments to both active and inactive participants, [B&L] may still be able to terminate the plans based on the plan termination provisions." Id., BL-LIT 000867. Weber concluded by "strongly recommend[ing]" that B&L discuss the COC provisions with its legal counsel before proceeding with any lump sum distributions. Id.

Zaucha and Reigle sought and received additional input on the COC provision from Nadir Minocher ("Minocher") at Westport Strategies ("Westport"). See Ex. K, BL-LIT 001650-51 (Email from

-4-

Minocher to Susan Miller; cc: to Reigle and Zaucha). Minocher opined that SERP I is "not an asset of B&L[;] it is beneficially owned by the executives as beneficiaries. A change of control at B&L should not have any effect on [SERP I]. . . . The design of the trust assures participants are fully protected in the event of any change at B&L." Id., 001650. Reigle followed up with Minocher on August 17, 2007, informing him that no decision had been made yet on the COC provision in SERP I. Reigle noted, "We want to make sure we are covering all ends before that decision is made. I think in the end everyone would like these SERP plans to go away, it's just doing it the correct way and covering all options." Ex. L, BL-LIT 000801 (Email from Reigle to Minocher).

On September 19, 2007, Zaucha wrote individually to Plaintiffs "to notify [them] that the change of control provisions under . . . [SERP I] will be triggered if the Company's shareholders approve the [Warburg] merger" and that "[i]n the event of a change of control, [their] SERP I benefits will be converted to a cash lump sum and paid to [them] within 15 days of the shareholder vote." Ex. M, BL-LIT 000143 (Letter from Zaucha to Gill). Gill's financial planner Patrick D. Martin ("Martin") sent an email to Zaucha that same day, stating that he would "discuss the proposal with [Gill]" at their upcoming meeting. Ex. R, BL-LIT 001679 (Emails from Martin to Zaucha). Zaucha responded "to clarify that this isn't a proposal", because "[t]he plan requires a lump-sum payout upon a

change in control." Id. Martin stated that he did "not see things that clearly under the Plan document regarding[,] among other things[,] the computation of the lump sum payout." Id. Zaucha replied that she would be "happy to meet with [Martin] regarding the differences in how [they] are interpreting the plan." Id.

Shareholders voted to approve the Warburg merger on September 21, 2007, and on September 24, 2007, Efrain Rivera, B&L Senior Vice President and Chief Financial Officer, directed Wells Fargo Bank, N.A., the SERP I trustee, to discontinue all monthly benefits payments under SERP I. Ex. N, BL-LIT 000894. On September 27, 2007, Zaucha wrote to Martin indicating that B&L still was "consulting with several actuaries and an additional law firm" regarding the amount of the lump-sum distribution to be paid to Gill and the other affected individuals. Ex. R, BL-LIT 001726. The lump-sum benefit amounts subsequently were submitted for payment to Plaintiffs on October 5, 2007. Ex. P, BL-LIT 000914.

Plaintiffs retained counsel, who wrote to Robert B. Stiles, Esq., B&L Senior Vice President and General Counsel on October 5, 2007, noting their concerns that "the lump sum payments are insufficient, by substantial amounts, to achieve the plan requirement" and requested a "process . . . for working through the numbers and attempting to stipulate to appropriate payments." Ex. S.

Plaintiffs further contended that the Plan explicitly provided for the trusts to survive any change in control of B&L. B&L responded that it was reviewing their claims and would contact them "to set up a process for providing information." On November 1, 2007, B&L advised Plaintiffs that in order to challenge the benefit payments, they were required to file a claim with the Board's Committee on Management. B&L further advised that it intended to establish a new Board of Directors, which would appoint a new committee to assume the responsibilities of the Committee on Management. At the time of this communication, no "Committee on Management" or ERISA-compliant claim review procedure in fact existed.

On November 21, 2007, the Board appointed three individuals to serve as the "Compensation Committee" and vested it with responsibility for all determinations concerning SERP I. On November 28, 2007, Plaintiffs wrote to the Board's "Committee on Management or Successor Committee" to contest the adequacy of the lump sum payments and to request that the Committee remedy the deficiency. On January 2, 2008, B&L's current Chairman and Chief Executive Officer advised Holmes that B&L and unnamed "advisors" had reviewed the 2007 decision and had referred the matter to the newly constituted Compensation Committee. On January 8, 2008, B&L sent a Company Position Statement in Response to SERP I Claims to the members of the Compensation Committee. Ex. T, BL-AR 000009. On

January 15, 2008, Plaintiffs' counsel expanded the bases for Plaintiffs' claims to include, <u>inter alia</u>, an assertion that "the Plan's change in control provisions do not apply to [Plaintiffs], because [Plaintiffs] had retired prior to the 2007 acquisition of the Company and, under the terms of the Plan, were therefore not subject to the lump sum cash-out provisions of the Plan that operate in connection with a change in control[.]" Ex. U, B&L/R&G 000079.

Sometime in February 2008, Jonathan Zorn, Esq. of Ropes & Gray LLC, the Compensation Committee's attorneys, sent Plaintiffs' attorneys the procedures established under the Plan, pursuant to Section 503 of ERISA, for consideration of Plaintiffs' claims under SERP I. <u>See</u> Ex. U, B&L/R&G 000047.

B&L, through its counsel, Proskauer Rose, actively advocated against Plaintiffs during the claims review process and were permitted to file submissions with the Compensation Committee. On April 14, 2008, plaintiffs were informed that their claims for benefits had been denied. The letter was signed by Zorn, counsel for the Compensation Committee, who stated that he was acting on behalf of the Plan Administrator, although the letter did not expressly identify the Administrator. The Compensation Committee subsequently denied Plaintiffs' appeal on December 11, 2008.

**C.    The Instant Action**

Plaintiffs filed the present lawsuit on January 29, 2009, asserting two claims under ERISA: (1) their benefits were terminated and wrongfully reduced under 29 U.S.C. § 1132(a)(1)(B); and (2) Defendants owe them additional information and documents under 29 U.S.C. § 1132(c)(1)(B). The second claim was dismissed by the Court (Siragusa, D.J.). <u>See</u> Dkt #24 at 10. The first claim, which remains pending, asserts that (1) the lump sum payments were less than the present value of the benefits to which Plaintiffs were entitled, and (2) the right-of-reversion created a conflict of interest which actually influenced Defendants' determination of Plaintiffs claims.

Extensive discovery proceedings ensued. <u>See</u>, <u>e.g.</u>, <u>Gill v. Bausch & Lomb Supplemental Retirement Income Plan I</u>, 2011 WL 2413411 (W.D.N.Y. June 10, 2011). Plaintiffs and Defendants both filed competing motions for summary judgment on April 16, 2012. Oral argument was heard by the Court (Siragusa, D.J.) on July 19, 2012, and the matter subsequently was referred to mediation, which was unsuccessful. The matter was transferred to District Judge Frank P. Geraci, Jr. on January 9, 2013, and then re-transferred to District Judge Charles J. Siragusa on March 21, 2013. The matter was transferred to the undersigned on February 18, 2014.

For the reasons set forth below, Plaintiffs' motion for summary judgment (Dkt #56) is granted, and Defendants' motion for summary judgment (Dkt #55) is denied.

## III. General Legal Principles

### A.    Summary Judgment Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The movant bears the burden of demonstrating the absence of any genuine issue of material fact. Celotex v. Catrett Corp., 477 U.S. 317, 323 (1986). Once the movant has carried that burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts", and instead "must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (internal quotations and citation omitted). Summary judgment is not defeated based on conclusory allegations or mere speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). When evaluating a motion for summary judgment, the court must assess the evidence in the light most favorable to the non-movant and must draw all reasonable inferences in that party's favor. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**B.    Breach of Fiduciary Duty Claims under ERISA**

ERISA empowers a "participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1). "[A] denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed [by a district court] under a <u>de novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>accord</u>, <u>e.g.</u>, <u>Conkright v. Frommert</u>, 559 U.S. 506, 512 (2010). Where the plan has conferred discretion upon the administrator, a reviewing court "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." <u>Pagan v. NYNEX Pension Plan</u>, 52 F.3d 438, 441 (2d Cir. 1995); <u>accord</u> <u>Tocker v. Philip Morris Cos., Inc.</u>, 470 F.3d 481, 487 (2d Cir. 2006) ("[I]t is now settled that if a plan administrator clearly has been granted discretionary authority in the plan documents, a court will defer to the administrator's decision. The grant of discretionary authority thus narrows the range of judicial oversight and shields a plan administrator's decision from a more searching and broader <u>de novo</u> review.") (internal citation omitted). Thus, a party's

-11-

fiduciary status is critical to determining which standard of review applies to the denial of benefits.

Section 1002(21)(A) of ERISA defines a fiduciary in several ways. In relevant part, that statute provides that a "person is a fiduciary with respect to a plan," and therefore subject to ERISA fiduciary duties, "to the extent" that he or she "exercises any authority or control respecting management or disposition of [plan] assets," or, "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) and (iii). ERISA thus "defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan . . . ." Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993) (citation omitted). The Second Circuit has explained that "Congress intended ERISA's definition of fiduciary 'to be broadly construed.'" LoPresti v. Terwilliger, 126 F.3d 34, 40 (2d Cir. 1997) (quoting Blatt v. Marshall & Lassman, 812 F.2d 810, 812 (2d Cir. 1987)). However, "even [this] broad construction has limits." Bell v. Pfizer, 626 F.3d 66, 74 (2d Cir. 2010) (quotation omitted; brackets in Bell). Falling outside the ambit of ERISA are those individuals "who perform ministerial tasks with respect to the plan, such as the application of rules determining eligibility for participating, preparation of plan communication materials, the calculation of benefits, and the maintenance of employee records." Bell, 626 F.3d at 74 (citing 29 C.F.R.

-12-

§ 2509.75-8 (1995); Blatt, 812 F.2d at 812). "Because employers often act as both plan administrators and employers, ERISA permits employers to 'wear two hats,' and not all actions by an employer fall under its fiduciary role." Bell, 626 F.3d at 74 (citation omitted).

**C.   Standards of Review Under ERISA**

While ERISA places the burden upon Plaintiffs to prove an entitlement to benefits under the Plan, Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998) (citation omitted), Defendants bear the burden of proving that the arbitrary and capricious standard of review applies, Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002) (citation omitted). The rationale behind this rule is that "the party claiming deferential review should prove the predicate that justifies it." Sharkey v. Ultramar Energy Ltd., 70 F.3d 226, 229 (2d Cir. 1995). Furthermore, "whether an insurance plan grants discretionary authority to a plan administrator" presents a question of law. Tiemeyer v. Community Mut. Ins. Co., 8 F.3d 1094, 1099 (6th Cir. 1993).

Defendants are entitled to the deferential "arbitrary and capricious" standard of review only if an authorized party made the challenged benefits determination; if an unauthorized party made the benefits determination, the denial is reviewed under the de novo standard. See, e.g., Sharkey, 70 F.3d at 299 (holding that the de novo standard is "the standard of review applicable to a

-13-

decision to revoke benefits when that decision is made by a body other than the one authorized by the procedures set forth in the benefits plan); accord Sanford v. Harvard Indus., Inc., 262 F.3d 590, 597 (6th Cir. 2001); Rodriguez-Abreu v. Chase Manhattan Bank, 986 F.2d 580, 584 (1st Cir. 1993) ("Because the relevant plan documents did not grant discretionary authority to the Plan Administrator and the Named Fiduciaries did not expressly delegate their discretionary authority to the Plan Administrator [who made the adverse benefits decision], we find that the district court correctly employed the de novo standard of review."); Baker v. Big Star Div. of the Grand Union Co., 893 F.2d 288, 291 (11th Cir. 1989); Candeub v. Blue Cross Blue Shield of Michigan, 577 F. Supp.2d 918, 926 (W.D. Mich. 2006) (citing, inter alia, Rubio v. Chock Full O'Nuts Corp., 254 F. Supp.2d 413, 423-25 (S.D.N.Y. 2003)).

## IV.  Discussion

### A.  The 2007 Decision by B&L Employees

#### 1.  Overview of the Parties' Arguments

Plaintiffs assert that the 2007 decision by B&L Human Resources personnel, set forth in, e.g., the September 19, 2007, letter sent by Zaucha to Plaintiffs, is the pertinent decision for this Court to review. Plaintiffs argue that B&L Human Resources personnel acted as unauthorized fiduciaries by performing discretionary functions in interpreting the Plan document and

terminating Plaintiffs' benefits, and that a <u>de novo</u> standard of review therefore should apply. Defendants counter that the actions by B&L Human Resources personnel were purely ministerial functions and permissible under the Plan. Defendants contend that the Zaucha letter, for instance, is totally irrelevant because only the Compensation Committee's decision is "ripe for judicial review". According to Defendants, the Compensation Committee acted as a duly authorized fiduciary, and therefore its 2008 decision must be judged under the arbitrary and capricious standard.

As discussed further below, the Court finds that (1) the 2007 termination of benefits and lump-sum payments as set forth in, <u>e.g.</u>, the Zaucha letter of September 19, 2007, and Rivera letter of October 5, 2007, was an "adverse benefits decision" within the meaning of ERISA; (2) the decision was discretionary in nature and was unauthorized because the B&L Human Resources employees involved had not been delegated authority to act as fiduciaries or administrators; (3) B&L intended the 2007 decision to be the final adverse benefits determination; and (4) it fails under a <u>de novo</u> standard of review.

### 2.   Proper Characterization of the B&L Human Resources Employees' Actions

"[T]rust law does not require a fiduciary to delegate his authority only to other fiduciaries. Rather, the trustee is at liberty to delegate administrative tasks to 'agents' or 'other persons' as is necessary to carry out the purposes of the trust."

Geddes v. United Staffing Alliance Employee Medical Plan, 469 F.3d 919, 926 (10th Cir. 2006) (quotation and citations omitted)). Pursuant to 29 U.S.C. § 1105, a plan administrator may delegate its fiduciary duties to a third party if the plan provides a clear process for such delegation.[2]

With regard to who or what entity was assigned discretionary authority under the Plan, SERP I provides that, subject to provisions not at issue here, "the Committee *shall have authority and discretion* to . . . determine the rights and benefits of Participants under the Plan, . . . , interpret the Plan, and make all determinations deemed necessary or desirable for the administration of the Plan." Plan, § 3 (emphasis supplied). "Committee" is defined as the "Committee on Management of the Board of Directors." Id., § 2(a). The Plan contains no delegation of discretionary authority to anyone other than the Committee on Management. See id., § 3.

The Plan states that it "shall be *administered* by the Vice President of Human Resources of [B&L], or by such other employees as the Committee may from time to time designate." Plan, § 3 (emphasis supplied). The parties disagree as to the scope of the aforementioned delegation. There is no indication that the

---

[2]

      Section 1105 of ERISA provides, in part, that "the instrument[s] under which a plan is maintained may expressly provide for procedures . . . for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities." 29 U.S.C. § 1105.

Committee on Management ever delegated authority to administer the Plan to "other employees" apart from the Vice President of Human Resources. Defendants argue that "SERP I designated multiple persons or entities with authority to determine the rights and benefits of SERP I participants, including but not limited to the Vice President of Human Resources, whom Defendants assert acted as the day-to-day administrator. However, the parties do not dispute that there was no individual who held the position of "Vice President of Human Resources." Plaintiffs contend that Defendants' characterization of SERP I, § 3 is inaccurate. The Court agrees that by the plain terms of SERP I, the only entity permitted to exercise discretionary authority was the Committee on Management. In any event, there is no evidence that the Committee on Management was involved in any respect with any of the decisions here at issue.

Zaucha was not even identified by the Committee on Management as an "other employee" who could "administer[ ]" the Plan. Neither was Reigle. It is also clear that neither of these individuals were delegated to possess discretionary authority under the Plan; as discussed above, only the Committee on Management was imbued with discretionary powers. Yet these two B&L employees were intimately involved with the decision to terminate Plaintiffs' monthly benefits and issue lump-sum payouts. Defendants contend Zaucha,

Reigle, and other B&L employees did not act in contravention of the Plan or ERISA because

> [a]ll of the day-to-day administrative tasks performed by Ms. Zaucha and her staff were *ministerial* in nature. The H[uman] R[esources] employees *recognized* that SERP I required lump sum payments within 15-days of the Change in Control, they communicated with Plaintiffs about the Change in Control, and then calculated the lump sums.

Dkt. #66, p. 7 of 15, n.3 (citing Dkt #55-2, ¶¶ 44-56) (emphases supplied).

The statute does not describe fiduciaries simply as administrators of the plan, or managers or advisers. Pegram v. Herdrich, 530 U.S. 211, 226 (2000). Rather, it defines an administrator, for example, "as a fiduciary only 'to the extent' that he acts in such a capacity in relation to a plan." 29 U.S.C. § 1002(21)(A). Thus, "the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint. . . ." Pegram, 530 U.S. at 226. Whether an individual or entity is acting as a "fiduciary" can only be defined by reference to the functions they perform. See id.; see also See Weaver v. Prudential Ins. Co. of Am., 3:10-cv-438, 2011 WL 4833574, at*9 (M.D. Tenn. Oct. 12, 2011) ("[Human resources employee] did not act in a purely ministerial role in counseling [plaintiff] regarding the impact of her divorce on her eligibility for benefits under the plan. He

clearly under took a discretionary task—interpretation of the plan's terms—related to the plan's management or administration.") (citing 29 U.S.C. § 1002(21)(A)).  Under 29 C.F.R. § 2509.75-8, persons who "have no power to make any decisions as to plan policy, interpretations, practices or procedures, but who perform [certain] administrative functions for an employee benefit plan, within a framework of policies, interpretations, rules, practices and procedures made by other persons" are not fiduciaries. Zaucha and Reigle assiduously avoided using the words "interpret" or "interpretation" in their deposition testimony when describing the actions they took in regards to SERP I, but their actions speak louder than their words:

- Zaucha "reviewed" SERP I "to determine what actions would be necessary . . . when the Change in Control would happen. . . ." Zaucha Depo. at 30:19-24, Ex. Y.

- Zaucha and Reigle sought advice from outside benefits consultants Mercer and Minocher regarding whether the COC provision applied to Plaintiffs. See Exs. J, K; Reigle Depo. at 36:6-37:24, Ex. Y.

- Reigle wrote to Minocher that "[n]o final decision has been made as of yet" regarding the COC provision in SERP I, and that "everyone would like these SERP plans to go away, it's just doing it the correct way and covering all options." Ex. L.

- Zaucha and Reigle reviewed the consultants' reports but rejected their opinions that the COC provision did not apply to Plaintiffs. See Reigle Depo. at 85:3-86:22, Ex. Y. Zaucha sent a letter on September 19, 2007, advising Plaintiffs that due to the COC, their SERP I benefits would be converted to a cash lump sum and they would receive no further benefits under SERP I. See Ex. M.

- After sending plaintiff Gill's financial advisor a letter regarding the impending termination of Plan benefits, Zaucha offered to meet with him regarding "the differences in how we are *interpreting the Plan*." Ex. R (emphasis supplied).

- Zaucha wrote to Gill's financial advisor, "We are consulting with several actuaries and an additional law firm. I'll contact you when *we have concluded our analysis*." Ex. R (emphasis supplied).

- Zaucha sent a letter dated October 1, 2007, to Gill's financial advisor stating that the "lump sum payout methodology has been reviewed internally, and has also been reviewed with [B&L]'s regular outside benefits counsel, with two actuarial firms, and with an external non-qualified benefits expert, who all agree with the calculation methodology. . . . [W]e have re-reviewed the methodology and Plan interpretation with the third parties referenced above, and we have also engaged another outside benefits lawyer for a further assessment of the matter." Ex. R.

- Rivera directed the Plan's trustee to cease all monthly payments to Plaintiffs and to make lump sum payments in amounts calculated by B&L employees. See Ex. N.

The above chronology of events indicates that B&L Human Resources personnel exhaustively discussed and debated the proper *interpretation* of SERP I, both in-house and with a host of outside benefits specialists, actuaries, and attorneys. Based upon their "interpret[ation][,]" Plan, § 3, of key terms and provisions in the Plan, B&L personnel "determine[d] the rights and benefits[,]" Plan, § 3, owed to Plaintiffs by terminating Plaintiffs' monthly benefits under the Plan and causing lump sum payments to be made to them. That B&L personnel performed discretionary duties "seems to [this Court] to be the common sense of the matter; and common sense often

makes good law." <u>Peak v. United States</u>, 353 U.S. 43, 46 (1957) (Douglas, J.).

For the foregoing reasons, the Court concludes as a matter of law that Zaucha, Reigle, and the other B&L employees involved in the 2007 termination of benefits acted as unauthorized Plan fiduciaries by engaging in actions that were discretionary in nature, most particularly, by interpreting what have become hotly-disputed Plan provisions and terms.

### 3.   Which Benefits Decision is Subject to Judicial Review by this Court?

Defendants contend that the 2007 decision by B&L employees, and the employees' fiduciary status at that time are irrelevant, "[b]ecause it is only the [Compensation] Committee's binding, fiduciary decision that is ripe for review[.]" Dkt #66 at 6 of 15 (citing <u>Funk v. CIGNA Group Ins.</u>, 648 F.3d 182 (3d Cir. 2011)). Plaintiffs assert that the 2007 letters from Zaucha informing them of the decision to issue lump-sum benefits payments were "final" because Zaucha, in email correspondence to Gill's financial advisor, stated that the decision was "not a proposal" in response to the financial advisor's requires to discuss the "proposed payments". According to Defendants, Plaintiffs' argument "confuses or conflates ministerial functions with ERISA's fiduciary functions[,]" Dkt #55-1 at 15 of 24, and overlooks ERISA's exhaustion requirement, Dkt #66 at 6-8 of 15.

As an initial matter, the Court finds that contrary to Defendants' contention, the 2007 decision by B&L employees was an "adverse benefit determination" within the meaning of ERISA. Under the statute, an "adverse benefit determination" is defined as "a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit. . . ." 29 C.F.R. § 2560.503-1(m)(4). In Price v. Xerox Corp., 445 F.3d 1054, 1056 (8th Cir. 2006), the claimant sought to have the definition in § 2560.503-1(m)(4) apply to the decision on the first appeal, for purposes of obtaining additional time to file a second appeal. The Eighth Circuit noted that "[t]he definition [of an adverse benefit determination is] unclear and, as the district court found, no case law interprets this specific provision." Id. However, that court found, "language elsewhere in the regulations indicates that only the initial denial of benefits"–not the decision on the first appeal of that denial–is an "adverse benefit determination" for purposes of ERISA. Id. The 2007 decision clearly operated to "terminate" Plaintiffs' benefits under SERP I.

Turning to the exhaustion issue, strictly speaking, ERISA "does not even contain a statutory exhaustion requirement[.]" Paese v. Hartford Life and Acc. Ins. Co., 449 F.3d 435, 445 (2d Cir. 2006). Rather, there is a "firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases." Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588, 594

(2d Cir. 1993) (internal quotation marks omitted); see also LaRue v. DeWolff, Boberg & Assoc., Inc., 552 U.S. 248, 258-59 (2008) (Roberts, C.J., concurring opn.) (discussing the "safeguard[ ]" of the exhaustion requirement read into the statute by numerous circuit courts of appeals). Defendants cite Funk, 648 F.3d 182, for the proposition that "[a] plan administrator's final, post-appeal decision should be the focus of review." Id. at 191 n.11. According to the Third Circuit, "[t]o focus elsewhere would be inconsistent with ERISA's exhaustion requirement." Id. (citing, inter alia, LaRue, 552 U.S. at 258-59 (Roberts, C.J., concurring opn.) (noting that claimants must "exhaust the administrative remedies mandated by ERISA § 503, 29 U.S.C. § 1133, before filing suit under § 502(a)(1)(B)")). Although the Third Circuit described as "misplaced" the district court's reliance on a plan administrator's initial, rather than final, decision, it went on to note that "a court may of course consider a plan administrator's pre-final decision as evidence of the decision-making process that yielded the final decision, and it may be that questionable aspects of or inconsistencies among those pre-final decisions will prove significant in determining whether a plan administrator abused its discretion." 648 F.3d at 191 n.11 (citation omitted).

In Funk, the Third Circuit cited a number of ERISA procedural rules to support its conclusion that the post-appeal decision should be the focus of judicial review. See 29 C.F.R.

§ 2560.503-1(h) (requiring that claimants subject to adverse benefit determinations be provided with a "reasonable opportunity" to appeal that adverse decision); 29 C.F.R. § 2560.503-1(h)(2)(i)-(ii) (requiring that claimant be provided appropriate notice and an opportunity to submit documentation and evidence supporting his or her claim); 29 C.F.R. § 2560.503-1(h)(2)(iv) & (3)(ii) (requiring that the plan administrator's review must "take[ ] into account all [additional information] . . . without regard to whether such information was submitted or considered in the initial benefit determination," "not afford deference to the initial adverse benefit determination," and be "conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual")).

Here, however, these rules have been violated or Defendants have argued that they do not apply. For instance, Defendants have denied that B&L's 2007 decision was an "adverse benefit determination", and there were no procedures in place at the time of that decision affording Plaintiffs a "reasonable opportunity" to appeal it. Likewise, Plaintiffs were not provided any notice of their right to appeal at the time of the termination of benefits, much less the reason for that termination, which were clear violations of ERISA. Moreover, the body hearing the appeal of an

adverse benefit determination is required to consider additional information without regard to whether such information was submitted or considered in the initial benefit determination. Here, however, the Compensation Committee did not solicit or consider any of the documentation produced in connection with B&L's 2007 review.

Finally, Plaintiffs have argued that the appeal was not conducted by a duly-authorized fiduciary. The fiduciary authorized under the Plan-the Committee on Management-had no involvement whatsoever with the 2007 decision to terminate Plaintiffs' benefits. Plaintiffs assert that the Compensation Committee has no discretionary authority to interpret the Plan because "only the Committee on Management [has] discretion" and "there is no evidence that the Committee on Management . . . had any involvement in the decisions at issue." Dkt. #56-6, pp. 13-14 of 29. Defendants concede that the "Committee on Management" had no involvement in determining Plaintiffs' claims but argue that this is irrelevant in light of the B&L Board of Directors' resolution, post-merger, reconstituting the "Committee of Management" as the "Compensation Committee" and authorizing the Compensation Committee to act as the Plan's fiduciary and to, inter alia, review Plaintiff's claims for benefits. Waltrip, a member of the B&L Board for more than two decades, testified that, before the COC, the Committee on Management and the Compensation Committee were "one and the same." Dkt. #55-13, Waltrip Depo., p. 11:6-7. After the COC, and during

the relevant time period when Plaintiffs asserted their benefit claims, the reconstituted B&L Board conferred discretionary authority with respect to SERP I on the "Compensation Committee." Dkt. #55-14, p. 5 of 6 (BL-LIT 000004) (copy of B&L Board resolution produced to Plaintiffs). This resolution was issued in furtherance of the authority vested in the Board under the Plan. Dkt. #55-6, p. 24 of 87 (BL-AR 000023) (allowing "resolution of the Board" to establish fiduciary powers of the "Committee").

Even assuming that the Board had the authority to re-constitute the "Compensation Committee" and to confer upon it the discretionary authority to act as the Plan fiduciary, it seems to this Court to be another example of Defendants elevating form over substance. It strikes the Court as anomalous that the entity which Defendants urge should be the considered the Plan fiduciary was not even in existence at the time Plaintiffs' benefits were terminated and their lump-sump payments issued. Instead, the Compensation Committee was "re-constituted" about two months after the Warburg acquisition and a month after Plaintiffs' attorney challenged the benefits termination by letter to B&L. Essentially, Defendants are arguing that the subsequent review by the Compensation Committee should act to "cure" the unauthorized decision-making by B&L employees. However, as discussed further below, the Compensation Committee's subsequent review itself was seriously flawed. Two wrongs do not make a right. See, e.g., Shelby County Healthcare

<u>Corp. v. Majestic Star Casino, LLC</u>, 06-2549, 2008 WL 82642, at *3-4
(W.D. Tenn. Mar. 20, 2008) (citing <u>Sanford v. Harvard Ind., Inc.</u>,
262 F.3d 590, 596 (6th Cir. 2001) (finding no clear error in
district court's application of <u>de novo</u> standard to review benefit
determination where unauthorized party had already decided to
rescind claimant's retirement benefits by the time entity with
discretionary authority reviewed the action, and the decision was
not made in compliance with plan procedures)).

### B.   The 2008 Decision Cannot Survive Arbitrary and Capricious Review

The Court believes that Plaintiffs have adequately shown that
"since there is no evidence that under [the benefit plan] the
administrator has the power to construe uncertain terms [i.e.,
terms of the trust] . . . , the proper standard of review is
<u>de novo</u>." <u>Firestone</u>, 489 U.S. at 111. In the interests of
efficiency, however, the Court shall assume that the Compensation
Committee's 2008 decision is the focus of this Court's review, and
that the arbitrary and capricious standard applies. As discussed
further below, the Court finds that the Compensation Committee's
2008 decisions cannot withstand scrutiny under the arbitrary and
capricious standard due to the pervasive bad faith in dealing with
Plaintiffs, the flagrant procedural violations, and the evidence
that the structural conflict of interest actually biased the
Committee's decision-making. <u>A</u> <u>fortiori</u>, neither the 2007 by B&L

employees nor the 2008 decision by the Compensation Committee can survive review under the more stringent <u>de</u> <u>novo</u> standard.

### 1.  The Arbitrary and Capricious Standard

When applying the arbitrary and capricious standard, the reviewing court may overturn a denial of benefits "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law[,]" <u>Pulvers v. First UNUM Life Ins. Co.</u>, 210 F.3d 89, 92 (2d Cir. 2000) (quotation marks and citation omitted), or there has been "a showing of bad faith or arbitrariness. <u>Miles v. New York State Teamsters Conference Pension & Ret. Fund Employee Pension Ben. Plan</u>, 698 F.2d 593, 601 (2d Cir. 1983) (citation omitted); <u>accord</u>, <u>e.g.</u>, <u>Demirovic v. Building Service 32 B-J Pension Fund</u>, 467 F.3d 208, 212 (2d Cir. 2006). Where both the fiduciary and the plan participant "offer rational, though conflicting, interpretations of plan provisions, the [fiduciary's] interpretation must be allowed to control." <u>Miles</u>, 698 F.2d at 601 (citation omitted). However, "[w]here the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." <u>Id.</u> (citation omitted).

In a situation where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of

interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Firestone, 489 U.S. at 115 (internal citation omitted). A conflict of interest thus does not preclude the application of the "arbitrary and capricious standard". Glenn, 554 U.S. at 116-17 (holding that a conflict is merely a factor to consider under deferential review); Frommert, 130 S. Ct. at 1647 ("[A] systemic conflict of interest does not strip a plan administrator of deference."). Rather, "[t]he weight properly accorded a Glenn conflict varies in direct proportion to the likelihood that the conflict affected the benefits decision." Durakovic v. Building Serv. 32 BJ Pension Fund, 609 F.3d 133, 139 (2d Cir. 2010). Claimants are not required to show that the conflict of interest actually affected the decision to terminate benefits. Cf. Glenn, 554 U.S. at 120 (Roberts, C.J., concurring opn.) (disagreeing with majority as to "*how* . . . a conflict should matter" and stating that should be considered on review "only where there is evidence that the benefits denial was motivated or affected by the administrator's conflict") (emphasis in original). The reason is simple: "'[S]moking gun; direct evidence of purposeful bias" in ERISA cases–as in other cases–is "rare." Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 379 (3d Cir. 2000), overruled on other grounds, Howley v. Mellon Financial Corp., 625 F.3d 788 (3d Cir. 2010). Thus, where the circumstances suggest a "higher likelihood" that the conflict of

interest affected the benefits decision, the court should give the conflict greater weight and the decision closer scrutiny. See Marrs v. Motorola, Inc., 577 F.3d 783, 789 (7th Cir. 2009) ("The likelihood that the conflict of interest influenced the decision is therefore the decisive consideration, as seems implicit in the [Glenn] majority opinion's reference to indications of 'procedural unreasonableness' in the plan administrator's handling of the claim in issue, 128 S. Ct. at 2352, and its suggestion that efforts by a administrator to minimize a conflict of interest would weigh in favor of upholding his decision. Id. at 2531.").

### a. Structural Conflict of Interest

Plaintiffs argue that Defendants operated under a conflict of interest stemming from the fact that there would be reversion of excess Plan funds to B&L/Warburg following the distribution of lump-sum benefits to them.  Defendants characterize B&L/Warburg's right of reversion to millions of dollars as an "alleged conflict" and argue that it was not a factor in the Compensation Committee's denial of Plaintiffs' claim for benefits.

The secular trust document established pursuant to SERP I, as well as ERISA itself, explicitly provide for the recapture of surplus assets by the employer after a pension plan has been terminated and accrued benefits have been allocated. See ERISA § 4044, 29 U.S.C. § 1344; Secular Trust, § 7.2 ("If excess assets remain after all benefits and administrative expenses have been

paid, the excess shall be returned to the Company. . . .").[3] In Glenn, the Supreme Court held that a conflict emerges where, as here, "it is the employer that both funds the plan and evaluates the claims" because "[i]n such a circumstance, 'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket.'" 554 U.S. at 112 (internal citation omitted); see also Miller v. American Airlines, Inc., 632 F.3d 837, 847 (3d Cir. 2011) ("Even in an actuarially grounded plan [such as SERP I], the employer provides the monetary contribution and any money saved reduces the employer's projected benefit obligation.").

The Court agrees with Plaintiffs that the Compensation Committee and B&L clearly operated under a structural conflict of interest in this case. Furthermore, there is ample circumstantial evidence leading to the conclusion that the structural conflict of interest biased the decision-makers against Plaintiffs' claims, and that the benefits denial actually "was motivated or affected by the . . . conflict." Glenn, 554 U.S. at 120 (Roberts, C.J., concurring opn.). As Plaintiffs point out, despite receiving clearly-stated opinions of two independent benefit consultants that the COC provision did not apply to Plaintiffs, B&L senior benefits analyst Reigle wrote to Westport (one of the consultants) that, "[i]n the end, everyone [at B&L] would like to see these SERP plans go away."

---

[3]   The Secular Trust is attached as Ex. H to the Kurland Aff.

Ex. L. In Zaucha's letter terminating Plaintiffs' benefits, she gave *no* reason for the decision.

Defendants also point to the deposition testimony of the three Compensation Committee members insisting that the conflict of interest in general, and the reversion right in particular, played no part in their deliberations. The Court accords this <u>post facto</u>, self-serving testimony little weight. More telling is Mackesy's email to the Compensation Committee's attorney at Ropes & Gray stating, "We should just deny there [sic] claim and get on with it." All three members of the Compensation Committee stood to gain directly from construing the COC to require termination of Plaintiffs' rights under the plan. As general partners in Warburg or Welsh Carson, the private equity firms that bought B&L, Mackesy, Carney, and Weatherman were not only directors of B&L, but owners, either directly or indirectly.

In addition, B&L, though its outside benefits counsel, Proskauer Rose, affirmatively advocated against Plaintiffs before the Compensation Committee in 2008. Through counsel, B&L drafted multiple submissions advocating in favor of affirming the 2007 decision to issue lump-sum payments and terminate Plaintiffs' rights under SERP I. <u>See</u> <u>Schultz v. Stoner</u>, No. 00 Civ. 0439, 2009 WL 455163, at *11 (S.D.N.Y. Feb. 24, 2009) ("[The employer]'s selection of persons not versed in employee benefits, its failure to provide them with advice regarding their fiduciary obligations,

and its strongly argumentative submission in opposition to the benefit claim suggest that the claims determination structure employed upon remand was one designed to favor the company's perspective rather than that of those claiming rights as plan participants or beneficiaries.").

As Plaintiffs note, the claims procedure established by the Compensation Committee's attorneys in February 2008 did not provide for B&L's participation in the administrative review process. See Dep. Ex. P-8, Ex. U. Indeed, as noted elsewhere, these claims procedures do not provide a mechanism for challenging an adverse benefits determination by B&L; rather, the procedures only provide for review of a "Claim", which is defined solely as a "request, demand or other claim for a Benefit brought by a Claimant or a Claimant's Representative." SERP I Section 503 Procedures § 1, Dep. Ex. P-83, Ex. U. The procedures therefore do not, and did not, provide a means for challenging an adverse benefit determination made, in the first instance, by B&L. This also violates ERISA. See 29 C.F.R. § 2560.503-1(b), (m)(4) (requiring plans to establish claims procedures for appeal of "adverse benefit determinations",[4] which include any "reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit. . . .").

---

[4] As discussed above, the 2007 B&L decision plainly constitutes an "adverse benefit determination."

-33-

The Supreme Court observed in <u>Glenn</u>, 554 U.S. at 118, that a conflict of interest should be weighted more heavily where the fiduciary "[takes] 'seemingly inconsistent positions [that are] both financially advantageous." <u>Id.</u> Defendants did just that with regard to the final sentence of Section 13, which provides that the "Plan and its associated trusts shall continue in effect and survive any Change of Control" and that "any successor to the Company shall assume the obligations of the Company under the Plan." Plan, § 13. Defendants argued that this continuity provision applies only to current employees of B&L, i.e., Participants, and does not apply to Retired Participants. Thus, Defendants argued that with *one section* of the Plan, there were two different classes of individuals covered: "Participants" was required to include "Retired Participants" in connection with the COC provision, in order for Defendants to be able to terminate Plaintiffs' benefits. However, in order for Defendants to be able to take financial advantage of the continuity provision of Section 13, Defendants had to argue that this final sentence only included "Participants" and excluded "Retired Participants", even though there was no language implicitly or explicitly indicating that this was the case. Indeed, there is no language anywhere in the Plan that supports this conclusion, which was conveyed by the Compensation Committee's attorney in a letter of April 14, 2008. <u>See</u> Ex. V. The Court agrees with Plaintiffs that this internally contradictory interpretation

of the continuity provision of Section 13 was necessary to further Defendants' goal of making SERP I "go away," in the words of B&L employee Reigle. See Ex. L.

Coupled with the flagrant and persistent procedural violations by Defendants, discussed further below, the evidence that B&L and the Compensation Committee both predetermined Plaintiffs' claims cannot be explained benignly. Instead, the Court is compelled to conclude that Defendants' conflict of interest actually affected their decision-making. See Prado, 800 F. Supp.2d at 1095, 1098 ("Liberty's marked hostility to any evidence relating to Liberty's conflict of interest being shared with Plaintiff during the claims process or put before the Court . . . create[d] the impression that the individuals handling and evaluating Plaintiff's claim on behalf of Liberty were less interested in offering a neutral and fair evaluation of Plaintiff's claim than they were in erecting procedural roadblocks."); see also Durakovic, 609 F.3d at 140 (administrator's deceptive or unreasonable conduct is evidence that a conflict likely affected decision-making).

### b.   Procedural Violations

In addition to the conflict of interest, the Court must take into account "various procedural factors underlying the administrator's decision-making process[.]." Miller v. American Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011). "[T]he procedural inquiry focuses on how the administrator treated the particular

claimant." Post v. Hartford Ins. Co., 501 F.3d 154, 162 (3d Cir. 2007), overruled on other grounds, Estate of Schwing v. Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009).

ERISA regulations provide that "the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review" unless they provide the claimant access to "all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii). A document is "relevant" to a claim if it:

> (i) Was relied upon in making the benefit determination;
> (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; [or]
> (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination. . . .

29 C.F.R. § 2560.503-1(m)(8). Paragraph (b)(5) requires that "claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5).

Plaintiffs' counsel made multiple attempts during the claims process to acquire information relevant to B&L's adverse benefits determination. B&L and the Compensation Committee summarily

rejected these requests, claiming that they had submitted all the information "received, reviewed, and considered" in evaluating Plaintiffs' claims, and that they were not obligated under ERISA to produce additional information. The Court here is particularly concerned with Defendants' attempts to prevent Plaintiff from seeing the Westport and Minocher reports, which were favorable to their position. Even if these reports were not relied upon by the Compensation Committee, ERISA regulations, namely, 29 C.F.R. § 2560.503-1(m)(8)(ii), clearly required their disclosure to Plaintiffs. Instead, Defendants actively concealed the existence of the Westport and Minocher reports from Plaintiffs during the claims review process, and then strenuously litigated against Plaintiffs efforts' to obtain discovery of them during this action. Regardless of the reason for Defendants' refusal to disclose relevant documents to Plaintiffs, ERISA was violated. See Prado v. Allied Domecq Spirits and Wine Group Disability Income Policy, 800 F. Supp.2d 1077, 1096 (N.D. Cal. 2011) ("There are two possible conclusions the Court can make from [Liberty's failure to disclose documents]. The first is that Liberty lacked administrative processes and safeguards to ensure claim determinations were made in accordance with plan documents and that similarly situated claimants were treated similarly, and that no statements of policy or guidance existed to guide Liberty's representatives in evaluating Plaintiff's claim. The second is that Liberty had such

processes, safeguards, and policies, but refused to share them with Plaintiff during the claims process. Either situation would violate ERISA regulations.").

### c. Abdication of Fiduciary Responsibility to Outside Counsel

Plaintiffs argue that the Compensation Committee failed to conduct a full and fair review of their claims because it abdicated its discretionary authority to outside counsel, Ropes & Gray. Defendants argue that the Compensation Committee simply consulted with Ropes & Gray, and that the Committee made the ultimate decision on Plaintiffs' claims.

"[N]othing set forth in ERISA prohibits plan administrators from relying on information provided by and following the recommendations of either in-house or outside attorneys for the employer who sponsors the plan." Ford v. Motorola Inc. Involuntary Severance Plan, No. CIV-03-1271-PHX-RGS, 2007 WL 162680, at *6 (D. Ariz. Jan. 18, 2007) (citing Bidwill v. Garvey, 943 F.2d 498, 508 (4th Cir. 1991)). However, under ERISA, "a plan fiduciary is specifically charged with providing a full and fair review of the claims brought, and it is improper to abdicate that responsibility by simply relying on the opinions of others." Neely v. Pension Trust Fund of Pension, Hospitalization and Benefit Plan of Elec. Ind., No. 00 CV 2013 SJ, 2003 WL 21143087, at *8 (E.D.N.Y. Jan. 16, 2003) (citing Crocco v. Xerox Corp., 956 F. Supp. 129, 139 (D. Conn. 1997) ("[T]he plan's fiduciary must consider any and all

pertinent information reasonably available to him.") (quoting Grossmuller v. International Union, United Auto. Aerospace & Agric. Implement Workers of Am., U.A.W., Local 813, 715 F.2d 853, 857 (3d Cir. 1983)), aff'd, 137 F.3d 105 (2d Cir. 1998). In Crocco, the fiduciary relied on the opinion and expertise of an outside consultant to determine whether the plan covered a participant's medical expenses. The district court's opinion, which was affirmed on appeal, found that by allowing the non-fiduciary to make the decision, the fiduciary to the plan was violating her obligation under ERISA. See Crocco, 137 F.3d at 108 (the "central inquiry is whether or not [the plan fiduciary] fully and fairly reviewed [the plan administrator's] denial of Crocco's claim for benefits").

Here, the Compensation Committee's counsel, Zorn of Ropes & Gray, drafted the ERISA Section 503 procedures for SERP I. Zorn prepared a proposed decision letter rejecting the claims; this became the final decision letter. The Compensation Committee made no changes-substantive or cosmetic. The communications produced during discovery indicate that the Compensation Committee's deliberations were essentially non-existent. As noted above, when Zorn requested additional time to consider Plaintiffs' claims, Mackesy replied, "We should just deny there [sic] claim and get on with it." Dep. Ex. P-93, Ex. W. Mackesy did not recall any discussions or in-person meetings with his two fellow committee members, Weatherman and Carney; he did not know who wrote the

decision letter; he was not aware of and did not read the SERP I trusts; and he did not recall any of the facts or circumstances he considered. Carney's testimony was similar, although he did read SERP I. Carney could not recall the substance of any of the Compensation Committee's discussions about the claims. Carney did not recall making any changes to Zorn's decision letter and was not aware of, and did not see, the Mercer or Minocher reports. Weatherman apparently had the least recollection about the Compensation Committee's actions: she did not recall reviewing SERP I, did not recall approving any document regarding the SERP I claims, and did not recall anything about the claim.

It is undisputed that Zorn and Ropes & Gray had not been delegated to exercise discretionary authority with regard to SERP I. However, the record indicates that Zorn determined Plaintiffs' claim and the subsequent appeal without any input from the putative fiduciary, the Compensation Committee. After receiving "marching orders" from Defendants, Zorn crafted arguments to justify a denial of Plaintiffs' claims. Courts look with disfavor upon such post-hoc rationalizations. As the Sixth Circuit observed in University Hosps. v. Emerson Elec. Co., 202 F.3d 839 (6th Cir. 2000),

> It strikes us as problematic to . . . allow the administrator to "shore up" a decision after-the-fact by testifying as to the true basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to

> defend the decision by developing creative <u>post</u> <u>hoc</u> arguments that can survive deferential review.

<u>Id.</u> at 849 n. 7. Just as the B&L employees performed discretionary functions in 2007 without any proper delegation of authority, so too did Zorn and Ropes & Gray in 2007. Because the Compensation Committee at best served as a rubber-stamp to its counsels' interpretation of the Plan, Plaintiffs' right to a "full and fair review" of their claims was abridged. <u>See</u>, <u>e.g.</u>, <u>Tholke v. Unisys Corp.</u>, No. 01 Civ. 5495(HB), 2002 WL 575650, at *4 (S.D.N.Y. Apr. 16, 2002) (where a plan fiduciary, a committee, "appears to have served only as a rubber-stamp for [a non-voting committee secretary's] 6-page report, which was endorsed on its face without further comment," there was no full and fair review of plaintiff's claims).

### C.    Remedy

The Second Circuit has instructed that a district court's review under the arbitrary and capricious standard is limited to the administrative record. For this reason, if a district court concludes that a fiduciary's decision was arbitrary and capricious, "it must remand to the [fiduciary] with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'" <u>Miller</u>, 72 F.3d at 1071 (quoting <u>Wardle v. Central States, Southeast & Southwest Areas Pension Fund</u>, 627 F.2d 820, 828 (7th Cir. 1980) (citing <u>Ruth v.</u>

<u>Lewis</u>, 166 F. Supp. 346, 349 (D. D.C. 1958)), <u>cert. denied</u>, 449 U.S. 1112 (1981)). Defendants have argued that if the Court finds that the Westport and Minocher reports should have been considered, remand to the Compensation Committee is required because these reports are not part of the administrative record. The Court finds this argument disingenuous given that it was Defendants who prevented the consultants' reports from being made part of the administrative record in the first instance. <u>See</u>, <u>e.g.</u>, <u>Zervos v. Verizon, N.Y., Inc.</u>, 277 F.3d 635, 648 (2d Cir. 2002).

However, the Court finds that this is a situation where "no new evidence could produce a reasonable conclusion permitting denial of the claim" and remand would be "useless formality[,]" <u>Wardle</u>, 627 F.2d at 828. The only conclusion permitted by the "new" evidence (the Westport and Minocher reports) is that Section 13 of SERP I does not apply to Plaintiffs who, at the time of the COC, were "Retired Participants", i.e., "former Participants", as opposed to "Participants", i.e., current employees of B&L. <u>See</u> Plan, § 2(f), (h). That Section 13 only applies to Participants is clear from that section read as a whole, which states that upon a COC, a Participant's date of vesting (i.e., the date of termination of employment) shall be the date of the COC. <u>Id.</u>, § 13. That language only sensibly applies to present employees of B&L (i.e. Participants) because it substitutes the COC date for the date of "Termination of Employment", defined as the "cessation of

the employer-employee relationship between the Participant and the Company for reasons other than disability." Plan, § 2(j). It does not make sense to apply that language to Retired Participants since they, as of the COC, had ceased being in B&L's employ.

The same language is used in Section 5, dealing with benefits for "Retired Participants", which are calculated based on the "vested Participant's age on the date of Termination of Employment." Plaintiffs undisputedly were receiving benefits under Section 5 as of September 19, 2009; having already undergone a "Termination of Employment", they were "Retired Participants".

Moreover, the final sentence of Section 13 provides that "[t]he Plan and its associated trusts shall continue in effect and survive any Change of Control and any successor to the Company shall assume the obligations of the Company under the Plan." Plan, § 13. If "Participants" and "Retired Participants" were one and the same, and if Section 13 were meant to cover "Retired Participants" also, then there were be no point in directing  that the "Plan" continue in effect and survive any COC, because there would be no longer any individuals for whose benefit the Plan and its associated trusts could operate.

As remand to the Compensation Committee would be futile, the Court hereby vacates the 2007 and 2008 decisions terminating Plaintiffs' benefits under SERP I.

## V.    Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment (Dkt #56) is granted to the extent that Court determines the following: (1) the lump sum payments made in October 2007, violated ERISA; (2) the direction to the SERP I trustee to discontinue Plaintiffs' monthly payments violated ERISA; (3) the refusal to pay any further monthly benefits required under SERP I since October 1, 2007, violated ERISA; and (4) the termination of SERP I violated ERISA. Defendants' motion for summary judgment (Dkt #55) is denied. In calculating Plaintiffs' damages, Defendants are entitled to a credit for the lump-sum payments already paid to Plaintiffs.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:      March 3, 2014
            Rochester, New York